IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **Rapides Parish School Board**, | |
| *Plaintiff,* | **Case No.** 1:24-cv-00567 |
| v. | **Judge** _____ |
| **United States Department of Education**; **Miguel Cardona**, in his official capacity as Secretary of the United States Department of Education; **Catherine E. Lhamon**, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; **United States Department of Justice**, **Merrick B. Garland**, in his official capacity as Attorney General of the United States; and **Kristen Clarke**, in her official capacity as Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, | **Magistrate Judge** _____ |
| | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## <u>COMPLAINT</u>

The Biden administration's redefinition of the word "sex" in Title IX forces schools across the country to embrace a controversial gender ideology that harms children—including the very children it claims to help. And it fundamentally undermines the statute Congress enacted fifty years ago.

Congress enacted Title IX to promote equal opportunity for women. Title IX prohibits educational institutions, like Plaintiff Rapides Parish School Board, from discriminating on the basis of sex, while allowing entities to maintain sex separation in some programs to equalize opportunity for girls and women and to protect

the privacy interests of all. For fifty years, "sex" has meant the biological binary: differences between male and female. The Department of Education, with approval from the Attorney General, has rejected that commonsense understanding in its new rule implement Title IX. *See* "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance." 89 Fed. Reg. 33,474 ("the Rule").

The Rule redefines "sex" to mean "gender identity," "sex characteristics," and "sex stereotypes" (among other things). What that means for schools is clear: Schools must *ignore* sex to promote a person's subjective "sense of their gender. And schools must do so even though it deprives their female students of the equal opportunities in education that Title IX promised in 1972. By rewriting federal law in this way, the Biden administration will force schools to impose widespread harms on young people and deny free speech rights.

The Court should hold the Rule unlawful, set it aside under the Administrative Procedure Act (APA), 5 U.S.C. § 706, and enjoin Defendants from enforcing it against Plaintiff Rapides Parish School Board.

## JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

2.     This Court has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

3.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

4.     The APA waives sovereign immunity and provides jurisdiction and a cause of action to review Defendants' actions and enter appropriate relief. 5 U.S.C. §§ 553, 701–06.

5.      This Court has equitable jurisdiction and remedial power to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

6.      This case seeks declaratory, injunctive, and other appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the APA, 5 U.S.C. §§ 701–06; and Federal Rule of Civil Procedure 57.

7.      This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

8.      Venue is proper in this Court and this division under 28 U.S.C. § 1391, including paragraph (e).

9.      Defendants are agencies of the United States and officers and employees of the United States or of any of its agencies acting in their official capacity or under color of legal authority.

10.     Plaintiff Rapides Parish School Board resides at 619 Sixth Street, Alexandria, Louisiana, in the Alexandria Division of the Western District of Louisiana, and no real property interest is involved in the action.

11.     A substantial part of the events or omissions giving rise to the claims occurred in this district, because the case concerns the effect of Defendants' regulation on Rapides Parish School Board and its operations in this division of this district.

12.     Plaintiff asserts its right under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## PARTIES

### *Plaintiff*

13.     Plaintiff Rapides Parish School Board is located at 619 Sixth Street, Alexandria, Louisiana, 71306.

14.     The school board operates 42 schools for students from pre-K through 12th grade.

15.     For the 2023–2024 school year, the pre-K through 12th grade student body numbered approximately 21,000.

16.     The school board receives federal funding administered by the United States Department of Education, including funding under the Individuals with Disabilities Education Act and Title I of the Elementary and Secondary Education Act.

17.     In the 2024 fiscal year, the school board received approximately $30 million from these and other federal funding sources. Federal funds account for approximately 10% of the school board's annual budget.

18.     Presently, all but one of the school board's campuses participate in Title I schoolwide.

19.     It would cause the school board significant financial harm to lose eligibility for these federal programs.

20.     The school board also receives funding from the State of Louisiana.

21.     I and other personnel have already spent at least ten hours of time and resources analyzing the Department of Education's new Title IX rule and obtaining legal advice on how the Rule applies to the school board.

22.     Seventh through twelfth grade physical education (P.E.) classes at Rapides Parish school campuses are sex-specific. P.E. classes regularly include contact sports, such as basketball and soccer.

23.     Rapides Parish schools offer extracurricular activities, including interscholastic athletics. Many school sports teams are sex-specific. For example, Rapides Parish high schools field separate boys' and girls' teams for basketball, cross country, powerlifting, soccer, swimming, and track.

24.     The school board complies with Louisiana law, including the Fairness in Women's Sports Act.

25.     The school board is aware of five current students at its high schools, six students at its middle schools, and two students at its elementary schools who have identified a gender identity that differs from their sex. One of these identifies as "nonbinary."

26.     The school board's practice is that all students, including those who identify a gender identity that differs from their sex, participate in school activities based on sex. For example, the school board would not enroll a male student in a girls' P.E. class, even if the male student self-identified as a girl.

27.     The school board's practice is that all individuals—including students and staff—use sex-designated private facilities (such as restrooms, locker rooms, or changing rooms) based on biological sex. Facilities designated for "men" or "boys" may be used by biological males only. Facilities designated for "women" or "girls" may be used by biological females only.

28.     The school board's employee conduct policy states: "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in pre-kindergarten through grade 12 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." Ex. 1-C.

29.     Many of the school board's policies rely on biological distinctions between male and female. For example, any search of a student's person must be done by a teacher or administrator "of the same sex as the student to be searched,

Ex. 1-A at 111, and sometimes in the presence of "[a] witness of the same sex," *id.* at 112.

30.    The school board does not have and does not intend to adopt a policy mandating that staff or students use pronouns that reflect students' perceived gender identity when doing so is inconsistent with a student's sex.

31.    Additional facts about Rapides Parish School Board are set out in the declaration of the board's superintendent, attached as Exhibit 1.

### Defendants

32.    Defendant United States Department of Education (DOE) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). DOE's address is 400 Maryland Avenue SW, Washington, D.C. 20202. DOE promulgated the Rule, and it implements and enforces Title IX and the Rule.

33.    Defendant Miguel Cardona is sued in his official capacity as Secretary of the United States Department of Education. His address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

34.    Secretary Cardona is responsible for the overall operations of the U.S. Department of Education, including the Department's administration of Title IX and the Rule.

35.    Defendant Catherine E. Lhamon is Assistant Secretary for Civil Rights at the United States Department of Education. Her address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

36.    Assistant Secretary Lhamon implements and enforces Title IX and the Rule in programs administered by the Department of Education.

37.    Defendant United States Department of Justice (DOJ) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). DOJ's address is 950 Pennsylvania Avenue NW, Washington, D.C. 20202.

38.     DOJ implements and enforces Title IX and the Rule, including by bringing enforcement actions for noncompliance on behalf of DOE and other agencies that administer federal funding programs.

39.     Defendant Merrick B. Garland is sued in his official capacity as Attorney General of the United States. His address is 950 Pennsylvania Avenue NW, Washington, D.C. 20202.

40.     The Attorney General is responsible for the overall operations of the U.S. Department of Justice.

41.     The Attorney General implements and enforces Title IX and the Rule, including by bringing enforcement actions for noncompliance on behalf of DOE and other agencies that administer federal funding programs.

42.     The Attorney General coordinates Title IX's implementation and enforcement by other executive agencies, including by approving Rules, regulations, and orders of general applicability implementing Title IX. 20 U.S.C. § 1682; Exec. Order No. 12250; 28 C.F.R. § 0.51.

43.     Defendant Kristen Clarke is sued in her official capacity as Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice. Her address is 950 Pennsylvania Avenue NW, Washington, D.C. 20202.

44.     Defendant Clarke implements and enforces Title IX and the Rule, including by bringing enforcement actions for noncompliance on behalf of DOE and other agencies that administer federal funding programs. 28 C.F.R. § 42.412.

45.     Defendant Clarke coordinates Title IX's implementation and enforcement by other executive agencies. 20 U.S.C. § 1682; Exec. Order No. 12250; 28 C.F.R. §§ 0.51, 42.412.

## BACKGROUND

I.    **Title IX**

    A.    **Title IX was enacted in 1972 to promote equal educational opportunities for women.**

46.    In 1972, Congress enacted Title IX, which forbids education programs or activities receiving federal financial assistance from discriminating on the basis of sex. Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).

47.    Title IX sought to eliminate discrimination against women in education and to provide men and women with equal educational opportunity. Its goal was to give women "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *United States v. Virginia*, 518 U.S. 515, 532 (1996).

48.    Before Title IX was enacted in 1972, women were excluded from many colleges and universities. Even where women were admitted, they were subject to higher admissions requirements and excluded from many programs, like law school and medical school.

49.    As summarized by DOJ, Title IX has been strikingly successful in accomplishing its goals:

> In 2009, approximately 87 percent of women had at least a high school education and approximately 28 percent had at least a college degree, up from 59 percent with a high school education and 8 percent with a college degree in 1970. Additionally, enrollment in higher education has increased at a greater rate for females than for males; since 1968,

8

the percentage of women between the ages of 25 and 34 with at least a college degree has more than tripled.

*Equal Access to Education: Forty Years of Title IX*, U.S. Dep't Just. 2 (June 23, 2012), https://perma.cc/3GFD-74YX.

### B. Title IX promotes equal opportunities for women in physical education and athletics.

50.     Before Title IX, schools often emphasized boys' athletic programs "to the exclusion of girls' athletic programs." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3rd Cir. 1993). Many high schools did not have girls' sports teams, which reduced the number of women who could compete in college. And the average university devoted a mere two percent of its athletic budget to women's sports.

51.     To end this discrimination against women in athletics, Title IX and its implementing regulations have long defined "program or activity" to include interscholastic athletics. *See* 34 C.F.R. § 106.41(a); 44 Fed. Reg. 71,413, 71,413–15 (Dec. 11, 1979); *id.* at 71,417–418.

52.     Title IX and its longstanding implementing regulations allow an entity subject to Title IX to provide athletic programs or opportunities separated by sex, and require those programs to do so in a manner that "provide[s] *equal athletic opportunity* for members of *both sexes*." 34 C.F.R. § 106.41(c) (emphasis added).

53.     Title IX recognizes that there are biological differences between the sexes, and these differences sometimes require differential treatment to provide equal educational opportunity.

54.     Title IX and DOE's longstanding regulations expressly permit schools to sponsor sex-specific sports teams "where selection for such teams is based on competitive skill or the activity involved is a contact sport," 34 C.F.R. 106.41(b), and

allow "separation of students by sex within physical education classes" for sports whose major activity involves bodily contact, 34 C.F.R. § 106.34(a)(1).

55.    The same regulations require institutions to "effectively accommodate the interests and abilities of *both sexes*" when offering sex-separated athletic programs. 34 C.F.R. § 106.41(c) (emphasis added).

56.    Title IX has been strikingly successful towards its intended goals of providing women with opportunities for athletic competition and scholarships. These developments have increased the opportunities for women and girls to benefit from being on athletic teams, developing skills associated with competitive sports, attending college on athletic scholarships, and participating in high-level competitions.

**C.    Title IX gives the federal government and private parties myriad enforcement mechanisms.**

57.    Institutions must adopt policies that comply with Title IX and the implementing regulations. They may not maintain policies that violate Title IX and the implementing regulations.

58.    Any member of the public may file a complaint about an educational institution that he or she believes is not complying with Title IX or the implementing regulations.

59.    DOE's Office of Civil Rights can investigate complaints alleging that an institution has violated Title IX and its implementing regulations. DOE also has the authority to initiate an investigation without receiving a complaint.

60.    If DOE's Office of Civil Rights finds a covered institution is noncompliant, DOE may require the institution to take remedial action at the risk of losing federal funding.

61.    The Supreme Court has interpreted Title IX to provide for a judicially implied private right of action, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709, 717

(1979), including a damages remedy, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992), and awards of attorney's fees under 42 U.S.C. 1988(b). *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218–19 (2022).

62.    Defendants claim that substantive requirements they impose through their Title IX regulation are enforceable through Title IX's private right of action,

63.    The Attorney General may bring an enforcement action against an educational institution that is not in compliance with Title IX and its implementing regulations.

## II.   The Biden Administration Imposes Gender-Identity Mandates on Federal Antidiscrimination Laws.

64.    At the direction of the President, federal administrative agencies are attempting to implement gender-identity mandates throughout federal law.

### A.   President Biden directed federal executive agencies to add gender identity to federal laws.

65.    In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the U.S. Supreme Court held that under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, terminating an employee "simply for being homosexual or transgender" constitutes discrimination "'because of … sex.'" *Id.* at 681.

66.    The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

67.    The Court also recognized that "transgender status" is a "distinct concept[ ] from sex." *Id.* at 669.

68.    The Court emphasized that "other federal or state laws that prohibit sex discrimination," such as Title IX, were not "before" the Court. *Id.* at 681.

69.    The Court did not compare Title IX's nondiscrimination provision with the distinct text of Title VII. *Compare* 42 U.S.C. § 2000e-2(a) (Title VII), *with* 20 U.S.C. § 1681(a) (Title IX).

70.     Nor did the *Bostock* Court address Title IX's provision allowing for sex-separated living facilities or any of the other distinctions between the two biological sexes that Title IX recognizes and permits.

71.     Even so, on his first day in office President Biden declared that *Bostock*'s analysis changed the meaning of all federal law on sex discrimination, claiming that any statutory reference to sex discrimination includes gender-identity discrimination "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021). The President ordered all his executive-branch agencies to implement this view. *Id.*

72.     A short time later, DOJ's Civil Rights Division issued a memorandum instructing all federal agencies that "*Bostock* applies to Title IX." Memorandum from Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Justice Civ. Rights Div., to Fed. Agency Civil Rights Dirs. and Gen. Couns. (Mar. 26, 2021), https://perma.cc/TUL5-9GAN ("Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972").

73.     To the school board's knowledge, the administration has yet to say that a single federal law banning sex discrimination does *not* ban "gender identity" discrimination.

**B.     The Department of Education at first tried to implement a gender-identity mandate through "guidance" documents.**

74.     Even before promulgating the Rule at issue, DOE engaged in other agency action to implement President Biden's Executive Order.

75.     *First*, DOE published in the Federal Register its "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on

Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*."
86 Fed. Reg. 32,637 (June 22, 2021) ("Interpretation").

76.     DOE concluded that the phrase "on the basis of sex" in Title IX has the
same meaning as the phrase "because of … sex" in Title VII and that this
interpretation "is most consistent with the purpose of Title IX." 86 Fed. Reg. at
32,638–39.

77.     So, relying on *Bostock*, DOE pledged to enforce its Title IX interpre-
tation and declared that it "will fully enforce Title IX to prohibit discrimination
based on sexual orientation and gender identity in education programs and
activities that receive Federal financial assistance from the Department." 86 Fed.
Reg. at 32,639.

78.     *Second*, Acting Assistant Secretary Suzanne B. Goldberg issued a
"Dear Educator" letter notifying Title IX recipients of the Interpretation and
reiterating that DOE "will fully enforce Title IX to prohibit discrimination based on
sexual orientation and gender identity." Letter to Educators on Title IX's 49th
Anniversary (June 23, 2021), https://bit.ly/3ksLLDj.

79.     The Dear Educator letter included a "fact sheet" issued by the Civil
Rights Division of the DOJ and the Office for Civil Rights ("OCR") at the
Department of Education. U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting
Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families,
https://perma.cc/KA47-U9LJ ("Fact Sheet").

80.     A federal court preliminarily enjoined enforcement of the Interpreta-
tion and the Fact Sheet in Louisiana and 19 other states. *See Tennessee v. U.S.
Dep't of Educ.*, 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022), *appeal docketed*
No. 22-5807 (6th Cir. June 13, 2022). That court concluded the challengers were
likely to show that the Interpretation was a legislative Rule under the APA that
required notice and comment, which was not conducted.

**C.     The Department of Education issues a new Rule that redefines "sex" to mean "gender identity."**

81.     Now DOE has undertaken notice-and-comment rulemaking. On April 29, 2024, DOE issued the Rule, which is entitled: "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance." 89 Fed. Reg. 33,474 (April 29, 2024).

**1.     The new definition of discrimination "on the basis of sex"**

82.     Under the Rule, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity[.]" 89 Fed. Reg. at 33,886. This new regulatory demand will appear at 34 C.F.R. § 106.10.

83.     The Department's rationale for its definition comes straight from *Bostock*: "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802; *see* 590 U.S. at 659–60 ("If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee— put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.").

84.     The Rule provides for discriminatory-intent liability, disparate-impact liability, hostile-environment liability, harassment liability, and other theories of liability on all of these bases.

85.     As the Department's notice of proposed rulemaking (NPRM) explained it, this provision is intended to codify the Department's view that "Title IX's broad prohibition on discrimination 'on the basis of sex' … encompasses, at a minimum, discrimination against an individual because, for example, they are or are perceived to be male, female, or nonbinary; transgender or cisgender; intersex; currently or

14

previously pregnant; lesbian, gay, bisexual, queer, heterosexual, or asexual; or gender-conforming or gender-nonconforming." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,532 (proposed July 12, 2022).

86.    Nothing on this point changed in the final Rule. The Rule says that Title IX applies to "discrimination against an individual based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity" because "[a]ll of these classifications depend, at least in part, on consideration of a person's sex." 89 Fed. Reg. at 33,493.

87.    The new regulatory provisions do not define "sex," "gender identity," or the other terms in this new definition.

88.    As to "sex," the Rule says, "it is not necessary to resolve the question of what 'sex' means in Title IX for the Department to conclude that no statutory provision permits a recipient to discriminate against students … in the context of maintaining certain sex-separate facilities or activities." 89 Fed. Reg. at 33,821.

89.    Nor does the Rule define "gender identity," though the Rule's preamble says that "gender identity … describe[s] an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809.

90.    The Rule's revised version of 34 C.F.R. § 106.10 treats the new enumerated bases of liability—sex stereotyping and the like—as overlapping ways in which Title IX addresses gender identity.

91.    For example, the Rule defines gender-identity discrimination to be sex discrimination, but the Rule also defines sex-stereotypes discrimination to be sex discrimination, and *also* considers sex-stereotypes discrimination to encompass gender-identity discrimination. *E.g.*, 89 Fed. Reg. at 33,516 ("A person's nonconformity with expectations about … the sex with which they should identify

implicate one's sex, and discrimination on that basis is prohibited."). Built on this framework, the Rule implements Title IX to prohibit educational institutions from distinguishing between persons based on sex in a vast set of circumstances. At the same time, the Rule implements Title IX to *require* educational institutions to ignore sex in favor of a person's "sense of their gender"—in other words, schools must treat a boy who identifies as a girl as if he were a girl (and vice versa). When this Complaint refers to the Rule and Defendants' actions prohibiting discrimination based on gender identity, Plaintiff intends to encompass any alternative theory that Defendants may use to achieve these ends.

### 2. The new "de minimis harm" standard: gender identity controls over sex

92.    The Rule revises 34 C.F.R. § 106.31(a)(2) to say:

In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b).

89 Fed. Reg. 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

93.    The Rule then specifies that "[a] policy or engaging in a practice that prevents a person from participating in an education program or activity *consistent with the person's gender identity* subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)) (emphasis added).

94.    DOE's view is that *any* consideration of sex presumptively causes harm, but when the statute allows sex-based separation anyway, sex-differentiation is permissible even though (DOE claims) it presumptively causes more than de

16

minim*is* harm. 89 Fed. Reg.33,814–15; *see* 87 Fed. Reg. at 41,536 (explaining that "regardless of whether some students might experience more than de minimis harm if excluded from a particular sex-separate living facility on the basis of sex, Congress has nonetheless permitted that exclusion").

95.     The Rule declares that these new standards apply to—and thus prohibit sex separation when applied to students who profess a gender identity different than their sex for—sex-separate restrooms and locker rooms, single-sex classes or portions of classes, and dress codes. 89 Fed. Reg. at 33,816.

96.     The Rule's preamble states that "§ 106.31(a)(2) does not apply to male and female athletic teams a recipient offers under § 106.41(b)." 89 Fed. Reg. 33,816 (discussing provision to be codified at 34 C.F.R. § 106.31(a)(2)). By this, DOE implies that separating athletic teams by sex (ignoring gender identity) might be permissible even if it causes "more than de minimis harm."

97.     This caveat does not appear to protect women's sports. First, the Rule elsewhere says that gender-identity discrimination is a kind of sex discrimination, 34 C.F.R. § 106.10, which requires schools to treat a boy who identifies as a girl as if he *were* a girl.

98.     Second, section 106.31(a)(2)'s gender-identity mandates exempt subsection (b) of 34 C.F.R. § 106.41, but not subsection (a). 89 Fed. Reg. at 33,887. Subsection (a) says, "[n]o person shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a) (2020) (emphasis added); *see* 89 Fed. Reg. at 33,887 (to be codified as 34 C.F.R. § 106.31(a)(2)).

99.     That means a school risks sex-discrimination liability if a student is excluded from athletics "on the basis of [gender identity]," or "on the basis of [sex

stereotypes].'' The upshot of the Rule is schools may have separate boys' and girls'
teams, but must let a male onto the girls' team if he identifies himself as a girl.
Thus, in practice under the Rule, schools cannot maintain teams that are truly
separated by sex.

100.    This tracks what the Biden administration has elsewhere stated about
Title IX's requirements. DOJ has recently and repeatedly argued that, under
existing 34 C.F.R. § 106.41(b), student athletes must be able to participate based on
their gender identity rather than their sex. *E.g.*, Brief for the United States as
Amicus Curiae in Support of Plaintiff-Appellant and Urging Reversal at 24–27,
*B.P.J. v. W. Va. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. April 3, 2023);
Statement of Interest of the United States at 1, 7, *B.P.J. v. W. Va. State Bd. of
Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42.

101.    Even if the Rule does not require gender-identity-based athletics, the
Interpretation and the Fact Sheet do. *See supra* ¶¶ 74–80.

102.    The school board has been protected by the preliminary injunction on
enforcement of the Interpretation and the Fact Sheet. But the school board will
need permanent protection from the Interpretation and the Fact Sheet.

103.    Moreover, the Rule's new section 106.31(a)(2) does not exempt P.E.
classes from its gender-identity mandates. Indeed, the Rule does not even mention
P.E. except to observe that "some sex-based distinctions may be appropriate in the
protective gear or uniforms a recipient expects students to wear when participating
in certain physical education classes are athletic teams." 89 Fed. Reg. at 33,824.

104.    Sex-specific P.E. classes have been permissible for decades. *See*
34 C.F.R. § 106.34(a). And girls are exposed to the same safety risks when
competing against males in P.E. class. *See supra* ¶¶ 169–72.

**D.     The Rule contradicts Title IX's text and history.**

105.    Although Title IX does not define "sex" or "on the basis of sex," Title IX's plain text, history, and past application all prove that these terms refer to sex according to *biology*, not "gender identity."

106.    The dictionary definition of the term "sex" has never—including when Title IX was enacted in 1972—meant "gender identity" as that term is used in the Rule. Instead, the word "sex" refers to the biological binary of male and female, or to the physiological and biological differences between male and female.

107.    For decades, Title IX has been understood to allow distinctions by sex. Recognizing the biological fact of differences between males and females is necessary to achieving Title IX's policy goal of promoting educational opportunity for women.

108.    Title IX specifies that it cannot be construed to prevent sex separation in "living facilities." 20 U.S.C. § 1686. That rule that has long been implemented in DOE's regulations to permit "separate … [h]ousing," 34 C.F.R. § 106.32(b)(1), as well as "separate toilet, locker room, and shower facilities," 34 C.F.R. § 106.33.

109.    The Rule eviscerates Title IX's respect for the biological differences between male and female by requiring schools to categorize students in line with their "gender identity" while ignoring their sex.

110.    The Rule also erases Title IX's longstanding recognition that sex in the human species is binary. *See, e.g.*, 20 U.S.C. § 1681(a)(2) ("both sexes"); 34 C.F.R. § 106.32(c)(2) (referring to "housing … provided to students of one sex, when compared to that provided to students of the other sex").

111.    For example, the Rule revises 34 C.F.R. § 106.21 by replacing the statutory term "both sexes" with the term "all applicants." 89 Fed. Reg. at 33,887**.** The notice of proposed rulemaking said that this change was "in recognition of the fact that some applicants may have a nonbinary gender identity." 87 Fed. Reg. at

41,517, 41,528. The final Rule's preamble continues to refer to the concept of a "nonbinary" gender. *See, e.g.*, 89 Fed. Reg. at 33807.

112.    That reasoning conflicts with the statute. Title IX's statutory text and its implementing regulations—until now—have used "sex" to mean the biological binary of male and female.

113.    Redefining discrimination "on the basis of sex" to include "gender identity" will preclude school policies and practices that recognize sex to equalize opportunity, ensure privacy, or safeguard students, such as separating P.E. classes, locker rooms, and school sports teams based on biological sex.

## III.    The Rule Injures the School Board.

114.    The Rule takes effect on August 1, 2024. It will impose immediate and long-lasting harm on the school board as well as its staff and students.

### A.    The Rule creates new liability risks for the school board.

115.    The Rule creates new risks for the school board because it could lose federal funding, incur significant burdens and costs, or face liability.

116.    Failure to follow the Rule and its interpretation of Title IX risks the burdens and costs of federal investigations and enforcement proceedings.

117.    Failure to follow the Rule and its interpretation of Title IX risks disallowance, exclusion, suspension, and debarment from receipt of federal funding.

118.    Failure to follow the Rule and its interpretation of Title IX risks liability for the school board under a cause of action in civil litigation, including in suits brought by private individuals.

119.    DOE requires any applicant for federal funds to assure that its programs "will be operated … in compliance" with Title IX and its implementing regulations and to "commit itself to take whatever remedial action is necessary … to

eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination." 34 C.F.R. § 106.4(a)

120.   The Rule appears inconsistent with Louisiana law on sports. This forces the school board to choose between, on the one hand, following what the Rule appears to demand on sports in violation of Louisiana law and, on the other hand, ignoring what the Rule says to comply with Louisiana law. Either way, the school board is exposed to liability.

121.   Under Louisiana's Fairness in Women's Sports Act ("Fairness Act"), "[e]ach intercollegiate or interscholastic athletic team or sporting event that is sponsored by a school and that receives state funding shall be expressly designated, based upon biological sex, as only one of the following:

(1) … [A] male, boys, or mens team or event shall be for those students who are biological males.

(2) A female, girls, or womens team or event shall be for those students who are biological females.

(3) A coeducational or mixed team or event shall be open for participation by biological females and biological males.

La. Stat. Ann. § 4:444(A) (2022).

122.   The Fairness Act specifies that "[a]thletic teams or sporting events designated for females, girls, or women shall not be open to students who are not biologically female." *Id.* § 4:444(B).

123.   The Fairness Act provides a private cause of action for any "biological female student who is deprived of an athletic opportunity or suffers or is likely to suffer from any direct or indirect harm as a result of a violation," or "who is subjected to retaliation or other adverse action by a school, athletic association, or other organization as a result of reporting a violation." *Id.* § 4:446(A), (B).

124.    The Fairness Act also provides a cause of action for "[a] school, school coach, school employee, school board, school board employee, school board member, postsecondary education board, or postsecondary education board member who suffers any direct or indirect harm for prohibiting a biological male from participating in a female, girls, or womens athletic team or sporting event pursuant to the requirements of [the Fairness Act]." *Id.* § 4:446(D).

125.    Relief under the Fairness Act includes but is not limited to "(1) [i]njunctive relief, protective order, writ of mandamus or prohibition, or declaratory relief to prevent any violation of [the Fairness Act]" and "(2) actual damages, reasonable attorney's fees, and costs." *Id.* § 4:446(E).

126.    At least 23 other states have similar laws. *See* Ala. Code § 16-1-52(b)(2) (2023); Alaska Admin. Code tit. 4, § 06.115(b)(5)(D) (2023); Ariz. Rev. Stat. § 15-120.02 (2022); Ark. Code § 6-1-107(b)–(c) (2021); Fla. Stat. § 1006.205(3)(a) (2021); Idaho Code § 33-6203(1) (2020); Ind. Code § 20-33-13-4 (2022); Iowa Code § 261I.2 (2022); Kan. Stat. §  60-5603 (2023); Ky. Rev. Stat. § 156.070(g) (2022); Miss. Code §§ 37-97-1 to 37-97-5 (2021); Mo. Rev. Stat. § 163.048 (2023); Mont. Code § 20-7-1306 (2023); N.C. Gen. Stat. § 116-401 (2023); N.D. Cent. Code § 15-10.6-02 (2023); Okla. Stat. tit. 70, § 27-106 (2022); S.C. Code § 59-1-500 (2022); S.D. Codified Laws § 13-67-1 (2022); Tenn. Code, § 49-6-310 (2022); Tex. Educ. Code § 33.0834 (2022); Utah Code § 53G-6-902 (2022); W. Va. Code § 18-2-25d (2021); Wyo. Stat. § 21-25-102 (2023).

127.    These laws align with Title IX's text and the DOE guidance issued and enforcement actions taken in the first four decades of Title IX's existence. *See supra* ¶¶ 46–56.

128.    The Rule's requirement that schools allow students to participate on sex-specific sports teams according to gender identity conflicts with Louisiana's Fairness Act.

129.    In a letter to all Louisiana school leaders and school boards, the
Louisiana Department of Education explained:

> [The] new Title IX rules could be in direct contradiction with
> Louisiana's Fairness in Women's Sports Act, a law that affirms school-
> sanctioned athletic participation must be divided by biological sex
> unless the configuration is co-ed in nature. While ED claims these new
> rules do not speak to sports, the new rules explicitly mentions athletics
> over 30 times. Clearly, sports in Louisiana could be impacted by the
> new rules and, if implemented, create a conflict with Louisiana law.

Memorandum from Dr. Cade Brumley, State Superintendent of Educ., to Sch. Sys.
Leaders & Sch. Bds. (April 22, 2024), https://www.louisianabelieves.com/docs/
default-source/links-for-newsletters/dr.-cade-brumley_title-ix-memo-4_22_2024.pdf
("Response to New Federal Title IX Rules").

130.    The Rule states that "a recipient's obligation to comply [with the Rule]
is not obviated or alleviated by any State or local law or other requirement[.]"
89 Fed. Reg. at 33,885 (to be codified at 28 C.F.R. § 106.6(b)); *see also id.* at
33,805–06.

131.    The school board's policy and practice are to comply with all Louisiana
laws, including Louisiana's Fairness in Women's Sports Act. *See* La. Stat. Ann.
§ 4:441–46. The Rule threatens to require the school board to violate state law as a
condition of receiving any federal funds.

132.    Disregarding the Fairness Act threatens the board's state funds—
funds that make up the bulk of the board's annual budget—and subjects the school
board to private lawsuits under the Fairness Act. *See* La. Stat. Ann. § 4:446.

**B.    The Rule imposes immediate, ongoing compliance costs.**

133.    Under the Rule, as a condition of continuing to accept federal funding
for education, the school board must begin immediately to repeal existing policies,
adopt new policies, make assurances to the federal government, and train staff to

comply with the Rule's new mandates. The school board will have to spend time and resources fulfilling these requirements.

134.   Covered educational institutions must agree to comply with the Rule, including the prohibition on discrimination on the basis of gender identity.

135.   The Rule requires covered entities to provide a notice of nondiscrimination stating that they will not discriminate on the basis of gender identity. *See* 34 C.F.R. § 106.8(a), (b). The school board will have to spend time and resources on these notices.

136.   The Rule prohibits covered institutions from stating that they will engage in actions or omissions inconsistent with the Rule's prohibitions on discrimination on the basis of gender identity. *See* 34 C.F.R. § 106.8(b)(2)(ii).

137.   Under the Rule, covered institutions must train current and new employees on the Rule's required policies and procedures. *See* 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.8(d)).

138.   The school board's existing policies use the term "gender" as a synonym for "sex," reflecting the board's understanding that both terms refer to the same concept: biological sex. *See, e.g.*, Ex. 1-A at 102, 104, 106. This will need to be amended to avoid confusion due to the Rule's new definitions. The school board will have to spend time and resources on these amendments.

139.   The school board's longstanding policies reflect Title IX's use of the term "sex" to mean the biological binary between males and females. For example, one policy states that "*[m]ale and female* students must be eligible for benefits, services, and financial aid without discrimination on the basis of sex." Ex. 1-A at 118 (emphasis added). This policy and others like it will need to be changed. The school board will have to spend time and resources on these amendments.

140.   The Rule will require careful review of—and likely additional changes to—other policies and practices established by the school board.

141.    The school board's existing practice is to separate restroom, locker room, and shower facilities by sex: males are not allowed to enter the girls' locker rooms, restrooms, or showers; likewise, females are not allowed to enter the boys' locker rooms, restrooms, or showers. Under the Rule, this will need to be changed. The school board will have to spend time and resources on these changes.

142.    Under the school board's existing policy, any search of a student's person must be done by a teacher or administrator "of the same sex as the student to be searched," Ex. 1-A at 111, and at times in the presence of "[a] witness of the same sex," *id.* at 112. For the privacy of students and staff, this policy would need to be reassessed based on the Rule. The school board will have to spend time and resources on amending this policy.

143.    Under the school board's existing policy, certain allegations of sexual harassment of an employee are assessed by a panel that includes "three males and three females selected by the Superintendent." Ex. 1-A at 101. The board would need to amend this policy based on the Rule. The school board will have to spend time and resources on these amendments.

144.    The school board's existing dress-code policy is different for "girls" than for "boys." Ex. 1-A at 98. The board would need to amend this policy to clarify how it applies to students who identify a gender contrary to their sex or as non-binary. The Rule arguably would require the board to permit students who identify as non-binary to choose which dress code applies to them even though other students would not have that same option. The school board will have to spend time and resources on these amendments.

145.    The school board's existing field trip policy requires that "any field trips consisting of boys and girls and requiring them to stay overnight must be chaperoned by faculty, staff, or parents of both sexes." Ex. 1-B. The board's practice is to house males and females separately on such trips. The school board does not

allow a biological male student who identifies as a girl to house with female students on such a trip, or vice versa. The board would need to reassess these field trip policies and practices based on the Rule. The school board will have to spend time and resources on amending this policy.

146.    The school board's longstanding policies do not make practical or logical sense under the Rule.

147.    For example, imposing the Rule's mandates onto the school board's existing search policy, a girl who identifies as a boy would have her person searched by an adult male and the search witnessed by another adult male. *See* Ex. 1-A at 111. Such situations would be intolerable to the school board and could also expose the board to liability. So the school board would need to find an alternative policy for searches.

148.    But if the board adopted a search policy for students who identify as a transgender that is different from the one that applies to other students, the board still risks liability for sex discrimination under the Rule.

149.    Under the Rule, the field trip policy (Ex. 1-B) would need to account for chaperones who identify as a gender identity different from their sex, such as a student's father who identifies as a woman. The Rule seemingly would require the school to place this chaperone in a room of girls. *See* 89 Fed. Reg. at 33,816 (explaining that the Rule applies to "any 'person,' … which also could include parents of minor students"). That situation would not be tolerable to the school board and could expose the school board to liability.

150.    The school board would need to amend its dress code policy (Ex. 1-A at 98–99) to account for students who identify as the opposite sex or as non-binary.

151.    The school board's employee conduct policy (Ex. 1-C) provides that "classroom instruction … on sexual orientation or gender identity may not occur in pre-kindergarten through grade 12 or in a manner that is not age-appropriate or

developmentally appropriate for students in accordance with state standards." The
school board risks violating the Rule unless it changes this policy.

152.    The school board would maintain each of these existing policies and
practices without the Rule. The cost of amending these policies is an injury to the
school board.

153.    At least thirteen students have identified a gender identity that differs
from their sex. *See* Ex. 1 ¶ 18. Under the Rule, the school board must immediately
allow these students to "participate in" school programs and activities "consistent
with their gender identity." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R.
§ 106.31(a)(2)).

154.    At a minimum, that will require that these students immediately be
allowed to use opposite-sex locker rooms, restrooms, and other sex-designated
spaces and to enroll in P.E. classes consistent with their gender identity.

### C.    The Rule will harm students in Rapides Parish.

155.    Allowing students to access sex-specific private spaces like locker
rooms according to their gender identity effectively eliminates the sex separation in
those spaces.

156.    The school board has determined that eliminating these sex-specific
private spaces violates the fundamental rights of privacy and safety.

157.    Rapides Parish schools separate such spaces by sex—meaning
biological sex. Males do not enter the girls' locker rooms, restrooms, or showers;
likewise, females do not enter the boys' locker rooms, restrooms, or showers.

158.    The presence of opposite-sex students in these spaces deprives children
of privacy and threatens their personal sense of safety and security. These harms
are more than de minimis, but the Rule disregards them.

159.    Because Title IX applies to employees of educational institutions, the Rule apparently would require the school to allow adults, such as parent volunteers, chaperones, teachers, and coaches, to access private spaces consistent with their gender identities. That harms students as well as other adults forced to share private spaces with a person of the opposite sex. These harms are more than de minimis, but the Rule disregards them.

160.    Requiring students to use restrooms, locker rooms, and showers in the presence of the opposite sex also deprives them of access to equal educational opportunity. Allowing males into spaces reserved for girls subjects girls to distress and embarrassment, at best, and an increased risk of harassment or assault, at worst. Preventing girls from accessing educational opportunities on equal terms goes against Title IX.

161.    The school board's physical education programs will also be harmed by the Rule because its schools must allow boys who identify as girls to enroll in the girls' P.E. classes.

162.    If a school maintains its policy of disallowing boys from enrolling in girls' P.E. classes, that policy would be unlawful sex discrimination under the Rule because the Rule says that "preventing [students] from participating in [school] consistent with their gender identity" subjects them to "more than de minimis harm." 89 Fed. Reg. at 33,887; *see* 34 C.F.R. § 106.41(a)–(c).

163.    This undermines the privacy and safety of the girls in those P.E. classes. These harms are more than de minimis, but the Rule disregards them.

164.    The school board's athletic programs and female athletes will also be harmed by the Rule, the Interpretation, and the Fact Sheet because schools must allow boys who identify as girls to participate on the girls' sports teams.

165.    This undermines the privacy and safety of the girls on those sports teams. These harms are more than de minimis, but the Rule disregards them.

166.    Athletics provides female students with countless advantages. Athletic participation is associated with positive educational outcomes, including better attendance, higher grades, fewer disciplinary issues, a greater desire to go to college, and higher advanced placement enrollment rates. Girls who participate in sports are more confident and have higher self-esteem.

167.    Participating in high school sports can provide girls with opportunities for athletic scholarships in college. These athletic scholarships lower the cost of higher education and provide other benefits including access to medical facilities, health benefits, travel expenses, and gear such as shoes, clothes, and bags.

168.    The Rule, the Interpretation, and the Fact Sheet threaten to reduce substantially the benefits of athletics to female student-athletes by requiring them to compete against males who identify as girls for spots on their school's teams and then to compete against males on opposing schools' female athletic teams.

169.    Males have physiological athletic advantages over similarly fit females, including in the respiratory, cardiovascular, muscular, and other systems. These result in higher short-term and sustained levels of oxygen to transport to the muscles and increased muscle fibers and muscle mass.

170.    These physiological differences between males and females directly result in stark disparities in the athletic record books because boys and men can consistently run faster and jump higher and farther than comparably fit girls and women.

171.    When males compete in female events, gifted and dedicated female athletes are denied the equal athletic opportunity that Title IX guarantees by being forced to compete against male athletes who have inherent and immutable advantages.

172.    Physiological differences between the two sexes, combined with basic principles of physics, also create enhanced risks of injury—and more severe

29

injuries—for female athletes when competing against male athletes than in competition involving female athletes only.

173.    Increasing numbers of boys and men are competing and trying to compete in female sports and depriving girls and women of athletic opportunities and accomplishments. For example, in Connecticut, two males competing in girls' high school track and field won 15 women's state championship titles—titles previously held by nine different girls.

174.    Providing physical education and athletic opportunities is part of the school board's educational mission.

175.    If the school board were to comply with the Rule, Rapides Parish schools would risk losing students to private schools that are not required to comply with the Rule and thus can keep recognizing the biological differences between boys and girls, including as they relate to physical education and athletics.

## IV.    The Rule Infringes on the Constitutional Rights of Teachers and Students.

176.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech … or the right of the people peaceably to assemble[.]" U.S. Const. amend. I. This requirement also applies to the States and to local government units like the school board through the Fourteenth Amendment's due process clause.

177.    By adding "gender identity" to Title IX, the Rule threatens the First Amendment exercise of board members, staff, and students. The Rule is facially invalid because it imposes vague and overbroad restrictions on speech that give enforcement officials unbridled discretion.

178.    For example, the Rule chills speech in favor of the traditional understanding that sex is binary or against the practice of transitioning a child to a gender identity that does not conform with his or her sex. There is a substantial

risk that students and staff will refrain from voicing their views on these topics or will simply acquiesce in using opposite-sex pronouns or names out of fear they will be accused of and punished for discriminatory harassment.

179.    The risk of such self-censorship is real. In schools that have adopted policies treating gender identity as "sex" for purposes of sex discrimination, teachers have faced discipline for refusing to use opposite-sex pronouns because this allegedly constitutes "sex-based" harassment or discrimination. *See, e.g., Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372, at \*1 (D. Kan. May 9, 2022); *Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*, Complaint, ECF 1, No. 5:22-cv-2237 (N.D. Ohio Dec. 12, 2022).

180.    Requiring staff and students to participate in social transitioning by using opposite-sex pronouns or an opposite-sex name, for example, infringes on their First Amendment right to be free from compelled speech.

181.    Public school teachers do not surrender their First Amendment rights as a condition of serving the public. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Their speech as citizens on matters of public concern is protected by the First Amendment. *Id.*

182.    A teacher's refusal to participate in a social transition through speech is constitutionally protected activity because refraining from participating in social transition implicates the teacher's interests as a private citizen, speech associated with social transition implicates matters of urgent public concern, and the government has no interest that could outweigh a teacher's First Amendment rights.

183.    A public school cannot "treat[ ] everything teachers … say in the workplace as government speech subject to government control." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 530–31 (2022). Endorsing the administration's

preferred gender ideology is not part of an educator's job duties, and refraining from doing so is protected.

184.    The Rule threatens the school board with Title IX liability unless it compels staff to speak consistent with the administration's preferred ideology about the nature of sex. At the same time, the Rule threatens Title IX liability unless the school board enacts overbroad policies about sex-based harassment that chill protected speech.

185.    Students' speech rights are also threatened by the Rule. The same speech (or refusal to speak) by a student could be treated as sex-based harassment or discrimination under the Rule. Under the Rule, schools are liable if a student's actions are "subjectively and objectively offensive" and "severe *or* pervasive." 89 Fed. Reg. at 33,494–96; *see id.* at 33,886 (to be codified at 34 C.F.R. 106.11).

186.    The Biden administration has consistently taken the position that failing to use opposite-sex names or pronouns is discriminatory under Title VII and section 1557 of the Affordable Care Act—a statute that incorporates Title IX. *See, e.g.*, U.S. Equal Employment Opportunity Commission, *Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity*, https://bit.ly/3RrIkwv (last visited Apr. 29, 2024). If failing to use opposite-sex pronouns or names is harassment, the school board risks liability if it does not require fellow students to speak in favor of an opposite-sex "gender identity" or discipline those who do not.

187.    Forcing students to speak consistently with, or refrain from speaking against, a hotly debated political viewpoint on questions about gender stigmatizes those who hold disfavored views. By treating legitimate decisions to speak or refrain from speaking as "sex-based harassment," the Rule infringes on First Amendment freedoms.

188.   Because the Rule requires the school board to treat protected expression as if it were sex-based harassment, the Rule would force the school board to amend its policies to violate the constitutional rights of staff and students and to chill wide swaths of protected speech.

## V.     The School Board's Urgent Need for Judicial Relief

189.   All the acts of Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

190.   The Rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

191.   No statute precludes judicial review of the Rule, and the Rule is not committed to agency discretion by law under 5 U.S.C. § 701(a).

192.   The Interpretation and the Fact Sheet are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

193.   No statute precludes judicial review of the Interpretation and the Fact Sheet, and they are not committed to agency discretion by law under 5 U.S.C. § 701(a).

194.   The school board has no adequate or available administrative remedy.

195.   In the alternative, any effort to obtain an administrative remedy would be futile.

196.   The school board suffers legal wrong and harm from the Rule and the Interpretation and the Fact Sheet.

197.   The school board is a regulated party under the Rule, the Interpretation, and the Fact Sheet.

198.   The Rule, the Interpretation, and the Fact Sheet are definitive and determine the rights and obligations of persons, including the school board.

199.   DOE declares that the Rule has the full force of law.

200.   The school board faces imminent irreparable harm and is susceptible to risk of enforcement under the Rule beginning on its effective date.

201.   The school board's compliance costs constitute ongoing irreparable harm caused by the Rule. The school board has no way to obtain monetary compensation from the federal government for its compliance costs.

202.   Absent injunctive and declaratory relief granted before the Rule's effective date, the school board has been and will continue to be harmed by the Rule's immediate, ongoing compliance costs and by continued exposure to legal penalties if it fails to adopt policies that align with the Rule's mandates.

203.   The school board has no adequate remedy at law.

204.   The equities favor the school board's request for injunctive relief or vacatur, which will maintain the status quo that has been in place for five decades.

**FIRST CLAIM**
**RULE—CONTRARY TO STATUTE**
**(5 U.S.C. § 706; 28 U.S.C. § 2201)**

205.   Plaintiff realleges and incorporates paragraphs 1–204 of this Complaint.

206.   Each Defendant Department is an "agency" under the APA. *Id.* § 701(b)(1).

207.   Under the APA, a court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory

34

jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

208.  The Rule is not in accordance with law and exceeds statutory jurisdiction, authority, and limitations in many respects.

209.  Title IX uses the word "sex" to mean the biological, binary distinction between male and female. Title IX repeatedly imposes an approach to educational opportunity that is cognizant of two sexes and their differences, using such terms as "both sexes" and the "opposite sex."

210.  The Rule imposes an approach irreconcilable with the statute. It requires schools to adopt a "nonbinary" approach to sex discrimination and sex differences. This rewrites the statute from one requiring equal opportunity for both sexes (often through the explicit consideration of sex differences) into one requiring equal opportunity based on gender identity. At the same time, the Rule requires equal treatment based on "nonbinary" or "asexual" gender identities—classifications that are defined without reference to a person's sex.

211.  Title IX prohibits discrimination "on the basis of sex" while specifically allowing distinctions based on sex differences to achieve equal opportunity. That prohibition does not include discrimination "on the basis of gender identity" as distinct from an individual's sex. *See supra* ¶¶ 105–13.

212.  Congress has not delegated to Defendants the authority to prohibit gender-identity discrimination under Title IX.

213.  Title IX expressly contemplates sex-specific educational programs. *E.g.*, 20 U.S.C. § 1686 (separate living facilities). The statute does not permit educational institutions to *ignore* sex in favor of gender identity.

214.  The Rule's gender-identity mandates make the statute nonsensical and unworkable. Under the Rule, students who claim a gender identity different from their sex could claim unlawful discrimination based on both gender identity and

sex. For example, consider a male student who identifies as a girl. It would be discrimination on the basis of sex to exclude this student from boys' locker rooms, but it would also be discrimination on the basis of gender identity to exclude this student from the girls' locker rooms. *See* 34 C.F.R. § 106.33. The student can demand access anywhere.

215.    DOE's "de minimis harm" standard is not found in the statutory text and goes against the rule of construction in 20 U.S.C. § 1686.

216.    Substantive canons of statutory construction preclude reading Title IX's references to "sex" to include "gender identity" that differs from a person's biology.

### Clear Statement Rule

217.    A clear statement is necessary for a statute to preempt the historical police powers of the States, to abrogate state sovereign immunity, or to permit an agency to regulate a matter in areas of traditional state responsibility. This is especially true when Congress conditions such a change in the balance of federal and state power on the receipt of federal funding.

218.    A clear statement is needed to displace the states' traditional authority over public education, which includes separating the sexes in physical education class and sports, as well as in school restroom facilities, locker room facilities, and shower facilities. When Title IX was enacted in 1972, the public lacked clear notice that Title IX would apply in the way mandated by this rule. The clear statement rule therefore precludes DOE from interpreting Title IX to include the Rule's redefinition of "sex."

219.    The Rule threatens to override state laws, including Louisiana's Fairness in Women's Sports Act.

***Major Questions Doctrine***

220.    The major questions doctrine also precludes reading "on the basis of sex" in Title IX to include the gender-identity mandates created by the Rule.

221.    Title IX's statutory text respects the biological differences between male and female. When biological differences matter, Title IX respects them by permitting sex-separated programs offered on equal terms. That includes housing, restroom facilities, locker room facilities, shower facilities, physical education classes, and sports.

222.    If Congress wanted to require schools to *ignore* biological differences for students who identify themselves with a different gender identity, it would have said so openly. Title IX, which is filled with references to the inherent biological differences between male and female, cannot be read to give administrative agencies like DOE authority to mandate that schools ignore the biological distinctiveness of girls and boys.

***Conditional Spending***

223.    When Congress imposes conditions on acceptance of federal funds under the spending clause, the Constitution limits the States and the public's obligations to those requirements "unambiguously" set out on the face of the statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

224.    No funding recipient could unmistakably know or clearly understand that Title IX would impose the gender-identity mandates created by the Rule as a condition of accepting federal funds from DOE.

225.    The public lacked the constitutionally required clear notice that the Act would apply in this way when Title IX was passed or when funding grants were made. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

226.    As a result, the Rule must be held unlawful and set aside under 5 U.S.C. § 706.

227.   The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

## SECOND CLAIM
## RULE—INFRINGES ON CONSTITUTIONAL RIGHTS
### (5 U.S.C. § 706; 28 U.S.C. § 2201; ULTRA VIRES)

228.   Plaintiff realleges and incorporates paragraphs 1–204 of this Complaint.

229.   Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

230.   Under the APA, a court must "hold unlawful and set aside agency action" if the agency action is "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

231.   A court has equitable jurisdiction to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

232.   The school board has standing to challenge the Rule because the Rule forces the school board to choose between respecting individuals' constitutional rights and complying with federal law. *See Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968) (school board had standing because the challenged law compelled members to "choose between violating their oath [to uphold the Constitution] and taking a step—refusal to comply with [the law]—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts").

233.   The school board has standing to vindicate the rights of staff and students under the First Amendment overbreadth doctrine. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1122 (11th Cir. 2022).

234.    The school board has third-party standing to vindicate the rights of staff and students. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). The school board is directly injured by the Rule because, as an educational institution that receives federal funding through DOE, it is the object of the regulation. *See supra* ¶¶ 16–19.

235.    The school board shares a close relationship with its staff and students and can effectively advocate for their First Amendment rights. *See Washington v. Trum*p, 847 F.3d 1151, 1160 (9th Cir. 2017); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487 (9th Cir. 1995).

236.    Staff and students face obstacles that bar them from effectively advocating for their First Amendment rights. Among other things, asserting their First Amendment rights on the hotly charged issue of gender identity subjects them to harassment and ostracization.

237.    The Rule's treatment of speech as discriminatory harassment will likely create "self-censorship and chilling of expression" by staff and students, *Clark v. City of Lakewood*, 259 F.3d 996, 1010 (9th Cir. 2001), making it appropriate for the school board to represent their interests.

238.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech … or the right of the people peaceably to assemble …." U.S. Const. amend. I. The First Amendment applies to the Sates and to the school board as incorporated through the Fourteenth Amendment.

239.    Students' speech is protected by the First Amendment.

240.    Educators' speech on matters of public concern is protected by the First Amendment.

241.    The Rule restricts and compels employee and student speech in violation of the First Amendment.

242.    The Rule would require the school board to adopt policies that both restrict and compel staff and student speech in violation of the First Amendment as incorporated through the Fourteenth Amendment.

243.    The Rule is so vague and overbroad that it will chill protected expression that disagrees with DOE and DOJ's view about the meaning of sex: "[M]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights … will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

244.    Adopting policies required by the Rule exposes the school board to lawsuits and liability for violating individuals' First Amendment rights.

245.    The Rule is contrary to law because DOE lacks authority to compel funding recipients to violate individuals' constitutional rights.

246.    As a result, the Rule must be held unlawful and set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

247.    The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

### THIRD CLAIM
### RULE—EXCEEDS FEDERAL POWER
### (5 U.S.C. § 706; 28 U.S.C. § 2201; ULTRA VIRES)

248.    Plaintiff realleges and incorporates paragraphs 1–204 of this Complaint.

249.    Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

250.    Under the APA, a court must "hold unlawful and set aside agency action" if the agency action is "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

251.    A court has equitable jurisdiction to review and enjoin ultra vires or unconstitutional agency action. *Larson*, 337 U.S. at 689–91.

252.    Even if DOE's interpretation of Title IX were a reasonable interpretation of the statute, it would be constitutionally impermissible because it exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the States under the federal constitution's structural principles of federalism and the Tenth Amendment. U.S. Const. art. I, § 8, cl. 1; *id.* amend. X.

253.    The Rule requires the school board to apply gender-identity mandates as a condition of receiving federal funding. Federal funding is approximately 10% of the school board's budget.

254.    Such a requirement is unconstitutionally coercive. The Rule requires the school board to adopt a controversial gender ideology or give up more than 10% of its budget and disregard the systems put in place over five decades. That leaves the school board with no meaningful choice. It is an improper use of the Spending Clause.

255.    The school board cannot accept the gender-identity mandates as applied to interscholastic sports because that would conflict with Louisiana's Fairness Act, *see* La. Stat. Ann. §§ 4:441–46, and the federal government cannot commandeer state and local governments in that way, *see Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018).

256.    Requiring Louisiana schools to give up all federal funding—which is what they would have to do to comply with the Fairness Act—amounts to a "gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (plurality). Similarly, requiring Louisiana to repeal the Fairness Act or deprive its

citizens of the billions of dollars in education funding that their federal tax dollars underwrite, *see id.* at 676–81 (Scalia, J., concurring in relevant part), is "economic dragooning that leaves the States with no real option but to acquiesce," *id.* at 582 (plurality).

257.    The Rule exceeds federal Spending Clause power.

258.    As a result, the Rule must be held unlawful and set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

259.    The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

## FOURTH CLAIM
## RULE—ARBITRARY AND CAPRICIOUS
## (5 U.S.C. § 706; 28 U.S.C. § 2201)

260.    Plaintiff realleges and incorporates paragraphs 1–204 of this Complaint.

261.    Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

262.    Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

263.    Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mf'rs Ass'n v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

264.    The Rule fails to define the key terms, "sex," "gender identity," "sexual orientation," "sex stereotypes," "sex characteristics," "transgender," and "sex assigned at birth."

265.    In drafting and promulgating the Rule, DOE failed to undertake reasoned decision-making in many respects.

266.    *First*, the Rule acts irrationally by explicitly resting its gender-identity regime on *Bostock*, even though *Bostock* said it did not encompass other civil rights statutes that address sex discrimination (as Title IX does) or circumstances implicating intimate or physical contact (as Title IX does). The agencies' explicit and pivotal reliance on *Bostock* represents a fundamental error at the heart of the Rule and renders it arbitrary and capricious on its face.

267.    *Second,* the Rule's gender-identity mandates are vague and impossible to apply. The Rule describes "gender identity" as "an individual's sense of their gender." This is undefinable and unworkable. Schools cannot know what it means or apply it consistently. It has no basis in the statutory text. It rejects the explicit biological binary of Title IX and therefore undermines the statute's purposes.

268.    The Rule imposes inconsistent requirements. For example, the Rule requires schools to let males who identify as girls into girls' P.E. classes and locker rooms even though limiting males from girls' programs is not a gender identity distinction. Yet DOE and DOJ consider such distinctions a violation of the Rule.

269.    34 C.F.R. §§ 106.10 and 106.31(a)(2) mandate gender-identity discrimination despite purporting to prohibit it. For example, under the Rule schools must let students use a locker room based on the sex with which they identify, meaning that a male who "identifies" as a boy cannot use the girls' locker room, but a male who identifies as a female can. The Rule requires the school to treat the two males differently based on gender identity, even as the Rule purports to prohibit discrimination based on gender identity. The Rule fails to consider this

important aspect of the problem. Such unexplained inconsistency is arbitrary and capricious.

270.    DOE's inclusion of "sex stereotypes" as a version of sex discrimination is also unreasoned. "[B]iological differences between males and females" are "not stereotypes associated with either sex." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *accord L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). DOE fails to explain why it considers biological differences to be sex stereotypes within the meaning of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality). That is a failure of reasoned decision-making.

271.    *Third*, the Rule ignores its effect on P.E. classes. Section 106.31(a)(2) will require that schools enroll male students in girls' P.E. classes (and vice versa). P.E. classes regularly include contact sports, such as basketball and soccer, and DOE's longstanding regulations allow separation by sex in those classes. *See* 34 C.F.R. § 106.34(a)(1). But the Rule now requires schools to allow students to participate in P.E. according to their gender identity instead of their sex. *See* 89 Fed. Reg. at 33,887 (to be codified at 106 C.F.R. § 106.31(a)(2)). The Rule ignores the harms this will cause girls and overlooks its impact on P.E. classes. DOE's failure to address this problem is a lack of reasoned decision-making.

272.    *Fourth*, DOE disregrads the effect of its Rule on school policies that direct staff not to tell parents when their children decide to identify as the opposite sex. Rather than disavow the parental-exclusion policies in the two example school policies that the NPRM cited with approval, *see* 87 Fed. Reg. 41,561, DOE continues to cite the same examples in the Rule, 89 Fed. Reg. at 33,709. DOE's failure to address how the Rule affects these parental-exclusion policies is a lack of reasoned decision-making.

273.    *Fifth*, the Rule does not consider the privacy interest in not exposing one's unclothed body to persons of the opposite sex. A student has a constitutionally

protected privacy interest in preventing persons of the opposite sex from seeing her unclothed or partially clothed body. *See, e.g.*, *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008). This interest in bodily privacy, which is protected even in prisons, *see, e.g.*, *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993), applies to public-school students in housing as well as restroom, locker room, and shower facilities. By putting persons of the opposite sex into these sex-specific spaces, the Rule creates a serious risk that students will be forced to expose their bodies to the opposite sex against their wishes. Children will reasonably hesitate to object lest the objection be taken as discriminatory harassment based on gender identity. DOE's failure to consider these privacy interests lacks reasoned decision-making.

274.    *Sixth*, the Rule does not explain DOE's reversal of its previous position that "restroom, locker room, and shower facilities" are "living facilities" subject to 20 U.S.C. § 1686.

275.    *Seventh*, DOE failed to consider schools' reasonable reliance interests when promulgating the Rule. For instance, the agency failed to consider the changes to longstanding policies, practices, and facilities that schools would need to undertake to comply with the Rule while respecting the privacy rights and safety interests of others. Schools adopted these policies and practices and built expensive facilities in reliance on DOE's prior positions. The failure to consider these reliance interests renders the Rule arbitrary and capricious.

276.    *Seventh*, DOE failed to consider any alternative policies, such as (1) taking no action; (2) creating rules to protect privacy and girls' equal access to athletic programs, including P.E. classes, under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

277.     Thus, the Rule must be held unlawful and set aside under 5 U.S.C. § 706.

278.     The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

**FIFTH CLAIM**
**INTERPRETATION AND FACT SHEET—CONTRARY TO LAW**
**(5 U.S.C. § 706)**

279.     Plaintiff realleges and incorporates paragraphs 1–204 of this Complaint.

280.     Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

281.     Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(C).

282.     An agency has no power to act unless Congress confers that power, and actions that are unauthorized by Congress are ultra vires.

283.     Title IX and its regulations do not prohibit discrimination on the basis of gender identity.

284.     The Interpretation's and the Fact Sheet's mandates to the contrary exceeds DOE's authority under Title IX and related regulations.

285.     Congress has not delegated to the executive branch any authority to impose the mandates found in the Interpretation and the Fact Sheet.

286.     The Interpretation's and the Fact Sheet's reading of Title IX must satisfy the clear-notice rule, a substantive canon of statutory interpretation that applies because DOE's construction displaces traditional state police power

46

authority, implicitly abrogates state sovereign immunity, and interprets Spending Clause legislation.

287.   The Interpretation and the Fact Sheet violate the major questions doctrine because Congress's enactment of Title IX did not unambiguously give DOE authority to impose the Interpretation and the Fact Sheet since it vastly changes the rights and obligations in Title IX.

288.   Because the Interpretation and the Fact Sheet exceed DOE's authority under Title IX and its implementing regulations, the Interpretation and the Fact Sheet are ultra vires, contrary to law, and issued in excess of DOE's authority.

289.   The Interpretation and the Fact Sheet go so far beyond any reasonable reading of the relevant congressional text and its implementing regulations that the Interpretation and the Fact Sheet functionally exercise lawmaking power reserved only to Congress. U.S. Const. art. I, § 1.

290.   The Interpretation and the Fact Sheet are contrary to law and exceed DOE's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to Title IX.

291.   The Interpretation and the Fact Sheet are contrary to law because, properly interpreted, Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on gender identity.

292.   The Interpretation's and the Fact Sheet's rationale is contrived for the President's policy convenience rather than based on law and necessary considerations under the APA. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

293.   As a result, the Interpretation and the Fact Sheet must be held unlawful and set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

## SIXTH CLAIM
## INTERPRETATION AND FACT SHEET—ARBITRARY AND CAPRICIOUS
### (5 U.S.C. § 706)

294.   Plaintiff realleges and incorporates paragraphs 1–204 of this Complaint.

295.   Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

296.   Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious" or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

297.   The Interpretation and the Fact Sheet, and Defendants' enforcement of them, explicitly rely on an interpretation of Title IX and a reading of *Bostock* that is erroneous.

298.   Without reliance on this legal interpretation, the Interpretation and the Fact Sheet would not have been promulgated.

299.   DOE failed adequately to consider important aspects of the issue.

300.   The Interpretation and the Fact Sheet create inconsistent and confusing standards, allow absurd results, lead to discrimination, and undermine other sex-based classifications. *See supra* ¶¶ 105–13.

301.   In promulgating the Interpretation and the Fact Sheet, DOE failed to consider a gender-identity mandate's effect on schools, staff, and students, including their constitutional rights, their interests in maintaining sex-specific facilities, and their interests in maintaining sex-specific athletic teams. *See supra* ¶¶ 114–88.

302.   In promulgating the Interpretation and the Fact Sheet, DOE failed to consider their impact on the interests of female athletes, including their privacy interests and their interests in receiving an equal opportunity to participate in and benefit from interscholastic athletics as part of their education. *See supra* ¶¶ 164–73.

303.    In promulgating the Interpretation and the Fact Sheet, DOE failed to consider reliance interests of schools in not being subject to a prohibition on discrimination on the basis of gender identity under Title IX. *See supra* ¶¶ 46–56, 105–13.

304.    In promulgating the Interpretation and the Fact Sheet, DOE failed to adequately acknowledge that the Interpretation and the Fact Sheet were a change in position from its existing regulations and initial post-*Bostock* guidance.

305.    DOE failed to consider any alternative policies, such as (1) taking no action; (2) creating regulations to protect female sports and privacy under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

306.    These failures render the Interpretation and the Fact Sheet arbitrary, capricious, and an abuse of discretion.

307.    The Interpretation's and the Fact Sheet's rationale is contrived for the President's policy convenience rather than based on law and necessary considerations under the APA. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

308.    As a result, the Interpretation and the Fact Sheet must be held unlawful and set aside under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Plaintiff Rapides Parish School Board respectfully prays for judgment in its favor and requests the following relief:

A.    That, pursuant to 5 U.S.C. § 706, this Court hold unlawful and set aside the Rule's definition of "sex-based discrimination" in 34 C.F.R. § 106.10, and the corresponding definition in the Interpretation and the Fact Sheet.

B.    That, pursuant to 5 U.S.C. § 706, this Court hold unlawful and set aside the Rule's de minimis harm provision in 34 C.F.R. § 106.31(a)(2).

C.    That this Court declare unlawful the Rule's definition of "sex-based discrimination" in 34 C.F.R. § 106.10, and the corresponding definition in the Interpretation and the Fact Sheet; as well as the de minimis harm provision in 34 C.F.R. § 106.31(a)(2).

D.    That this Court declare unlawful the Rule's de minimis harm provision in 34 C.F.R. § 106.31(a)(2).

E.    That this Court issue a declaratory judgment and permanent injunction preventing Defendants, including their employees, agents, successors, and all persons in active concert or participation with them, from implementing, enforcing, or applying the Rule or the Interpretation and the Fact Sheet to require covered institutions to:

1.    Apply Title IX's prohibition on discrimination "on the basis of sex" as a prohibition on discrimination on the basis of gender identity.

2.    Apply Title IX's prohibition on discrimination "on the basis of sex" as a prohibition on discrimination on the basis of sex stereotypes.

3.    Enroll students in classes or athletic programs based on students' gender identity instead of their sex.

4.    Open single-sex housing, locker rooms, changing rooms, showers, and restrooms to individuals of the opposite biological sex.

5.    Mandate that students or staff participate in or affirm a self-identified transgender student's gender transition, including by requiring students or staff to use an opposite-sex name or personal pronouns.

6.    When enforcing Title IX's sex-based harassment prohibitions, treat disfavored speech on the topics of gender identity, transgenderism, or gender dysphoria as prohibited harassment; or treat failure to use opposite-sex pronouns or names as prohibited harassment.

F.    That this Court issue all necessary and appropriate process, including a preliminary injunction and temporary order under 5 U.S.C. § 705, to postpone the effective date of the Rule or to preserve status or rights pending conclusion of the judicial review proceedings.

G.    That this Court award to Plaintiff attorneys' fees, costs, and other expenses of this action under any applicable federal statute, including 28 U.S.C. § 2412.

H.     That this Court grant the requested injunctive relief without a condition of bond or other security being required of Plaintiff; and

I.     That this Court grant any other relief that is equitable, just, and proper.

J.     That this Court retain jurisdiction over this matter for the purpose of enforcing its orders.

Respectfully submitted this 30th day of April, 2024.

s/ Michael T. Johnson
**Michael T. Johnson**
LA Bar No. 14401
**Johnson, Siebeneicher & Ingram**
2757 Highway 28 East
Pineville, Louisiana 71360
Telephone: (318) 484-3911
Facsimile: (318) 484-3585
mikejohnson@jslawfirm.com

**Matthew S. Bowman***
DC Bar No. 993261
**Natalie D. Thompson** (Trial Attorney)
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org
nthompson@ADFlegal.org

**Julie Marie Blake***
VA Bar No. 97891
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

*Counsel for Plaintiff Rapides Parish School Board*

*\*Motion for pro hac vice admission filed concurrently*

*\*\*Motion for pro hac vice admission filed concurrently; practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.*