## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **Rapides Parish School Board**, | |
| *Plaintiff,* | **Case No. 1:24-cv-00567-TAD-JPM** |
| v. | **Judge Terry A. Doughty** |
| **United States Department of Education**, et al., | **Magistrate Judge Joseph H. L. Perez-Montes** |
| *Defendants.* | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION TO DELAY EFFECTIVE DATE AND FOR
## <u>PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iv

Introduction ........................................................................................... 1

Background ............................................................................................ 2

I.    Congress enacted Title IX to promote educational opportunities for women. ................................................................................................. 2

II.    The Department of Education adds a gender-identity mandate to Title IX, destroying women's equal opportunities. .......................................... 3

III.    The gender-identity mandate will injure the school board by forcing it to risk all federal funds—which are 10 percent of its budget—or adopt harmful policies at significant cost ............................................................. 7

Legal Standard ...................................................................................... 8

Argument .............................................................................................. 9

I.    The school board is likely to succeed on the merits. .......................... 9

    A.    The gender-identity mandate is contrary to law. .................... 9

        1.    Statutory text and structure prohibit the agency from transplanting *Bostock*'s Title VII standard onto Title IX. .......... 9

        2.    Historical background and context foreclose a gender-identity mandate that deprives girls of privacy and opportunities. ............................................................................ 13

        3.    Constitutional canons of statutory construction require rejecting the Rule. .................................................................... 15

            a)    The agency has not shown clear congressional authorization. ......................................................... 16

            b)    The agency's reading of Title IX would exceed Congress's Spending Clause power. ............................... 16

            c)    The agency's interpretation ignores the major-questions doctrine ............................................... 18

    B.    The Rule infringes on First Amendment rights. ................... 19

    C.    The Rule is arbitrary and capricious. .................................... 21

II.    The school board will be irreparably harmed by the Rule. ............................ 23

III.   The equities and the public interest favor the school board. .......................... 23

Conclusion ................................................................................................................ 25

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ............................................................................. 20

*Adams ex rel. Kasper v. School Board of St. Johns County,*
    57 F.4th 791 (11th Cir. 2022) ............................................... 13, 14, 16

*Adams v. School Board of St. Johns County,*
    3 F.4th 1299 (11th Cir. 2021) ........................................................... 14

*Allen v. Vertafore, Inc.,*
    28 F.4th 613 (5th Cir. 2022) ............................................................... 9

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998) ........................................................................... 19

*Bauer v. Lynch,*
    812 F.3d 340 (4th Cir. 2016) ............................................................ 15

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ....................................................................... 18

*Bond v. United States,*
    572 U.S. 844 (2014) ........................................................................... 16

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ................................................................... passim

*Brannum v. Overton County School Board,*
    516 F.3d 489 (6th Cir. 2008) ............................................................ 14

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority,*
    636 F.2d 1084 (5th Cir. 1981) .......................................................... 25

*Clark ex rel. Clark v. Arizona Interscholastic Ass'n,*
    695 F.2d 1126 (9th Cir. 1982) .......................................................... 13

*Clark v. Martinez,*
    543 U.S. 371 (2005) ........................................................................... 19

*Cohen v. Brown University,*
    101 F.3d 155 (1st Cir. 1996) ............................................................ 13

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
    562 U.S. 277 (2011) .................................................................................. 11

*Cummings v. Premier Rehab Keller, PLLC,*
    596 U.S. 212 (2022) ............................................................................ 16, 17

*Davis v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ................................................................................ 6, 7

*Department of Homeland Security v. Regents of the University of California,*
    140 S. Ct. 1891 (2020) ....................................................................... 12, 23

*Doe v. Luzerne County,*
    660 F.3d 169 (3d Cir. 2011) .................................................................... 14

*Eknes-Tucker v. Governor of Alabama,*
    80 F.4th 1205 (11th Cir. 2023) ............................................................... 22

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................................................. 21

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ..................................................................... 11, 13, 20

*G.G. ex rel. Grimm v. Gloucester County School Board,*
    824 F.3d 450 (4th Cir. 2016) .................................................................. 14

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ................................................................................ 19

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................ 16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ................................................................................ 20

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) .................................................................... 9

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ................................................................... 16

*L. W. ex rel. Williams v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ................................................................... 22

*L.M. v. Town of Middleborough,*
    677 F.3d 29 (D. Mass. 2023) .................................................................. 19

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ............................................................. 8

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
  370 F.3d 275 (2d Cir. 2004) ............................................................ 15

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ................................................ 19, 20, 21

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*
  760 F.2d 618 (5th Cir. 1985) .......................................................... 24

*Motor Vehicle Manufacturers Ass'n v. State Farm Auto Mutual Insurance Co.,*
  463 U.S. 29 (1983) ......................................................................... 22

*Muldrow v. City of St. Louis,*
  144 S. Ct. 967 (2024) ..................................................................... 11

*Murphy v. National Collegiate Athletic Ass'n,*
  584 U.S. 453 (2018) ................................................................. 17, 18

*National Federation of Independent Business v. Sebelius,*
  567 U.S. 519 (2012) ................................................................. 16, 17

*Neal v. Board of Trustees of California State Universities,*
  198 F.3d 763 (9th Cir. 1999) .......................................................... 13

*Neese v. Becerra,*
  640 F. Supp. 3d 668 (N.D. Tex. 2022) .............................................. 11

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021) ......................................................................... 9

*Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation,*
  715 F.3d 1268 (11th Cir. 2013) ....................................................... 23

*Parham v. Hughes,*
  441 U.S. 347 (1979) ....................................................................... 15

*Pennhurst State School & Hospital v. Halderman,*
  451 U.S. 1 (1981) .................................................................... 16, 18

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) ......................................................................... 22

vi

*Poe v. Leonard,*
    282 F.3d 123 (2d Cir. 2002) ................................................................ 14

*Port Authority Trans-Hudson Corp. v. Feeney,*
    495 U.S. 299 (1990) ........................................................................... 18

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) ........................................................................... 22

*Sackett v. Environmental Protection Agency,*
    598 U.S. 651 (2023) ........................................................................... 16

*Security Exchange Commission v. Chenery Corp.,*
    318 U.S. 80 (1943) ............................................................................. 12

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ........................................................................... 17

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) .............................................................. 20

*United States v. Varner,*
    948 F.3d 250 (5th Cir. 2020) ........................................................... 7, 20

*United States v. Virginia,*
    518 U.S. 515 (1996) ........................................................................... 20

*Vlaming v. West Point School Board,*
    895 S.E.2d 705 (Va. 2023) ................................................................. 20

*Wages & White Lion Investments, LLC v. Food and Drug Administration,*
    16 F.4th 1130 (5th Cir. 2021) ..................................................... 8, 23, 25

*West Virginia v. Environmental Protection Agency,*
    597 U.S. 697 (2022) ........................................................................... 18

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................... 13

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................. 23

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ........................................................................... 16

**Statutes**

20 U.S.C. § 1681.................................................................................. passim

20 U.S.C. § 1686.......................................................................... 6, 10, 12, 16

42 U.S.C. § 2000e-2............................................................................. 3, 9

5 U.S.C. § 705.................................................................................... 2, 8

5 U.S.C. § 706........................................................................................ 9

La. Stat. Ann. § 4:444(A) (2022) ........................................................... 8

La. Stat. Ann. §§ 4:441–46 (2022) ...................................................... 17

Pub. L. 93-380, § 844, 88 Stat. 484, 612 (1974) ................................... 3

**Other Authorities**

118 Cong. Rec. 5807 (Feb. 28, 1972) ..................................................... 3

Brief for the United States as Amicus Curiae in Supporting Defendant-
    Appellee and Urging Affirmance, *Kluge v. Brownsburg Cmty. Sch.
    Corp.*, 64 F.4th 861 (7th Cir. 2023) ................................................... 7

*Equal Access to Education: Forty Years of Title IX*,
    U.S. Dep't Just. (June 23, 2012) ..................................................... 2, 3

Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom*
    (2021) ............................................................................................... 18

**Rules**

Federal Rule of Civil Procedure 65(c) ...................................................... 25

**Regulations**

34 C.F.R. § 106.10 .................................................................................. 5

34 C.F.R. § 106.31 .................................................................................. 5

34 C.F.R. § 106.32 .............................................................................. 2, 6

34 C.F.R. § 106.33 ..................................................................... 5, 6, 12, 14

34 C.F.R. § 106.34 ...................................................................... 5, 11, 12

34 C.F.R. § 106.41 ............................................................................ 2, 5, 6, 11

34 C.F.R. § 106.44(a) ............................................................................ 1, 20

40 Fed. Reg. 24,128 (June 4, 1975) ................................................................ 3

86 Fed. Reg. 7023 (Jan. 20, 2021) ................................................................ 4

87 Fed. Reg. 31,432 (May 24, 2022) .......................................................... 25

87 Fed. Reg. 42,390 (July 12, 2022) .......................................................... 22

89 Fed. Reg. 33,474 (April 29, 2024) .................................................. passim

**INTRODUCTION**

Through the new Title IX rule issued by the Department of Education (ED), the Biden administration is forcing schools across the country to embrace a radical gender ideology that harms students, teachers, and particularly girls—the very group Title IX sought to help. The Rule fundamentally undermines the statute Congress enacted fifty years ago.

Congress enacted Title IX to promote equal opportunity for women and girls. The law prohibits educational institutions from discriminating on the basis of sex, and its text references the biological, binary reality that a human is either male or female. Because there are enduring biological differences between the two sexes, Title IX recognizes that schools may separate the sexes to equalize opportunity for women and girls and to protect the privacy interests of all. Title IX's anti-discrimination rule differs from Title VII and other antidiscrimination statutes in this crucial respect: Title IX does not require blindness to sex. Instead, it requires *considering* sex to promote equal opportunity.

ED's new rule rejects that longstanding consensus. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (April 29, 2024) (the Rule). The Rule says unlawful discrimination "on the basis of sex" includes discrimination based on "sex stereotypes," "sex characteristics," and "gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). And when distinguishing between the sexes, schools must (absent an agency-sanctioned exception) ignore biology in favor of a person's "sense of their gender." 89 Fed. Reg. at 33,809; *see id.* at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). On top of that, the Rule threatens free speech rights; anyone who fails to speak consistently with the Biden administration's gender ideology may be investigated for "sex-based harassment." *See, e.g.*, *id.* at 33,884, 33,889 (to be codified at 34 C.F.R. §§ 106.2, 06.44(a)).

1

On campus, the ramifications are significant. While restrooms, locker rooms, overnight accommodations, and shower facilities may still be nominally sex-specific, schools must allow access based on "gender identity." That means males who identify as female will be in girls' locker rooms. While regulations have long allowed sex-specific physical education classes and instruction on "human sexuality" for schoolchildren, *see* 34 C.F.R. § 106.32, gender identity will control there too. That means males in girls' P.E. class and females in boys' sex-ed. And as much as the agency would like to hide it, the same is true of interscholastic sports. A school must allow a male who identifies as a girl to try out for the girls' basketball team because, under the Rule, to do otherwise is sex discrimination. 34 C.F.R. § 106.41(a); *see* 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10).

The Court should delay the Rule's August 1, 2024, effective date or preliminarily enjoin enforcement of its gender identity mandate and definition of sex-based harassment. 5 U.S.C. § 705.

## BACKGROUND

### I.   Congress enacted Title IX to promote educational opportunities for women.

In 1972, Congress enacted Title IX of the Education Amendments, 20 U.S.C. § 1681 et seq., which forbids education programs or activities receiving federal financial assistance from discriminating based on sex. As of 1970, just eight percent of American women had a college degree, and only 59 percent had graduated from high school. *See Equal Access to Education: Forty Years of Title IX*, U.S. Dep't Just. 2 (June 23, 2012), https://perma.cc/3GFD-74YX ("*DOJ Equal Access*"). Title IX provides: "No person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The

statute exempts traditionally single-sex institutions and certain sex-specific programs from its requirements. *See id.* § 1681(a)(5)–(9). Congress peppered the statute with explicit references to the biological, binary categories of two sexes and included a rule of construction recognizing respect for "personal privacy." 118 Cong. Rec. 5807 (Feb. 28, 1972) (statement of Sen. Bayh); *see* 20 U.S.C. § 1681.

Two years later, Congress enacted legislation instructing ED's predecessor agency to promulgate regulations "which shall include with respect to inter-collegiate athletic activities reasonable provisions concerning the nature of particular sports." Pub. L. 93-380, § 844, 88 Stat. 484, 612 (1974). Those regulations "require[ ]" a school "to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" 40 Fed. Reg. 24,128, 24,134 (June 4, 1975) (codified at the equivalent of 34 C.F.R. § 106.41(c)(1)).

Title IX has been strikingly successful. Women and girls now benefit from opportunities to attend college and develop skills associated with competitive sports. As of 2009, "87 percent of women had at least a high school education" and "28 percent had at least a college degree." *DOJ Equal Access*, *supra*, at 2.

## II.    The Department of Education adds a gender-identity mandate to Title IX, destroying women's equal opportunities.

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, terminating an employee "simply for being homosexual or transgender" constitutes discrimination "'because of … sex.'" *Id.* at 681. The Court said:

> An employer violates Title VII when it intentionally fires an individual employee based in part on sex. … If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have

yielded a different choice by the employer—a statutory violation has
occurred.

*Id.* at 659–60. The Court recognized that other antidiscrimination laws, such as

Title IX, were not "before" it, and emphasized that its decision did "not purport to

address bathrooms, locker rooms, or anything else of the kind." *Id.* at 681.

On his first day in office, President Biden purported to extend *Bostock* to the

entire United States Code. He declared that any statutory reference to sex

discrimination includes gender-identity discrimination "so long as the laws do not

contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg.

7023, 7023 (Jan. 20, 2021). Disregarding Congress's "indications to the contrary,"

the challenged Rule imposes a Title IX gender-identity mandate through two key

regulatory provisions.

*First*, the Rule defines Title IX's prohibition of "sex-based discrimination" to

include "discrimination on the basis of *sex stereotypes*, *sex characteristics*, … and

*gender identity*." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10)

(emphasis added). ED applies *Bostock*'s reasoning to Title IX, declaring that

"discrimination on each of those bases is sex discrimination because each

necessarily involves consideration of a person's sex, even if [the word "sex"] is

understood to mean only physiological or 'biological distinctions between male and

female,' as the Supreme Court assumed in *Bostock*." 89 Fed. Reg. at 33,802. As the

Rule puts it, "sex discrimination" is "any discrimination that depends" even "in part

on consideration of a person's sex." *Id.* at 33,803.

*Second*, the Rule creates a "de minimus harm" standard for sex distinctions:

> In the limited circumstances in which Title IX or this part permits
> different treatment or separation on the basis of sex, a recipient must
> not carry out such different treatment or separation in a manner that
> discriminates on the basis of sex by subjecting a person to more than
> de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through
> (9) and the corresponding regulations §§ 106.12 through 106.15,

4

> 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or
> § 106.41(b). Adopting a policy or engaging in a practice that *prevents a*
> *person from participating in an education program or activity consist-*
> *ent with the person's gender identity subjects a person to more than de*
> *minimis harm on the basis of sex.*

89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)) (emphasis added).
Together, sections 106.10 and 106.31(a)(2) create a gender-identity mandate: when
schools distinguish between male and female students, they must do so based *not* on
biological sex, but on "gender identity" (i.e., a person's subjective "sense of their
gender," 89 Fed. Reg. at 33,809). Thus, despite purporting to apply *Bostock*, the
Rule undermines the very assumption on which *Bostock* was based: "that 'sex' …
refer[s] only to biological distinctions between male and female." 590 U.S. at 655.

The gender-identity mandate applies in many situations, including where it
makes the least sense. Rather than cabin the mandate's scope, the Rule applies the
gender-identity mandate to longstanding regulations for "separate toilet, locker
room, and shower facilities," 34 C.F.R. § 106.33, "[c]ontact sports in physical
education classes," lessons on "[h]uman sexuality," *id.* § 106.34(a)(1), (2), and inter-
scholastic sports, *id.* § 106.41(a). Under the Rule, then, schools must allow biological
males into female restrooms, locker rooms, and showers. They must allow biological
males to play against girls in P.E. class athletics. They even have to assign
biological males to the health class covering the female reproductive system.

ED suggests that the gender-identity mandate does not apply to sports, but
the Rule's text shows that isn't so. ED cites the exception for subsection (b) of
§ 106.41, which authorizes schools to have "separate teams for members of each sex
where selection for such teams is based upon competitive skill or the activity
involved is a contact sport." *See* 89 Fed. Reg. at 33,816. But the gender-identity
mandate still applies to subsection (a) of § 106.41, which prohibits sex
discrimination "in any interscholastic, intercollegiate, club or intramural athletics

offered by a recipient," and says that "no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). That is, schools may have girls' sports teams, but a male who identifies as female must be treated as a girl and allowed on the team. Indeed, in other litigation that is what the Biden administration already insists is required. *See* Compl. (Doc. 1) ¶¶ 100–01.

The only other areas exempted from the gender-identity mandate in § 106.32(a)(2) are 20 U.S.C. § 1681(a)'s exemptions from Title IX's general nondiscrimination rule (e.g., youth service organizations, *id.* § 1681(a)(6))(2)), and single-sex "living facilities," 20 U.S.C. § 1686. But the Rule interprets "living facilities" so narrowly that it covers only "housing" under 34 C.F.R. § 106.32(b)(1)— not "toilet, locker room, and shower facilities" under *id.* § 106.33. So while the Rule permits schools to limit dormitories to biological females, it eliminates that same option when it comes to other bathrooms and locker rooms, as well as overnight accommodations on field trips.

Finally, the Rule lowers the threshold for actionable harassment. The Rule defines "sex-based harassment" as "sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2). Compared with the existing interpretation of Title IX in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Rule creates a "broader standard" for evaluating harassment allegations, 89 Fed. Reg. at 33,498, and sets a lower threshold for what constitutes a hostile environment:

> Unwelcome sex-based conduct that is sufficiently severe *or* pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies *or limits* a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment).

89 Fed. Reg. at 33,884 (emphasis added); *compare with Davis*, 526 U.S. at 633 (harassment must be "so severe, pervasive, *and* objectively offensive that it

effectively *bars the victim's access* to an educational opportunity") (emphasis added). Under the Rule, "a single serious incident" may be unlawful harassment, but so is "pervasive conduct," even if not severe. 89 Fed. Reg. at 33,500. And "a complainant [need not] demonstrate any particular harm, such as reduced grades or missed classes"; *any* "impact on their ability to participate or benefit from the education program or activity" is enough. *Id.*

These provisions have serious ramifications for free speech on campus. The Biden administration, after all, has repeatedly contended that it is discriminatory to fail to use gender-identity-based pronouns when a person wants to be treated as the opposite sex. *See* Compl. ¶ 186; Brief for the United States as Amicus Curiae in Supporting Defendant-Appellee and Urging Affirmance at 27–30*, Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th Cir. 2023). This would force staff and students to adopt the view that gender identity matters more than sex. *Cf. United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020) (gender-identity-based pronouns can "convey … tacit approval of the litigant's underlying legal position").

## III. The gender-identity mandate will injure the school board by forcing it to risk all federal funds—which are 10 percent of its budget—or adopt harmful policies at significant cost.

Plaintiff Rapides Parish School Board provides public education to 21,000 students in pre-K through twelfth grade at 42 school campuses. Compl. Ex. 1 (Doc. 1-1) ¶¶ 4–5. The school board receives federal funding administered by ED, including funding under the Individuals with Disabilities Education Act (IDEA) and Title I of the Elementary and Secondary Education Act. *Id.* ¶ 6; Ex. A ¶ 8 & A-1. In the 2024 fiscal year, the school board received about $30 million from these and other federal funding sources. Ex. A ¶ 7. Federal funds account for around 10 percent of the school board's annual budget, Compl. Ex. 1 ¶ 7, and losing eligibility for this funding would cause significant financial harm, *id.* ¶ 9.

The school board cannot comply with the Rule without changing its longstanding policies and practices. Today, students participate in school activities based on sex. Compl. Ex. 1 ¶ 14. That includes, for example, enrollment in sex-specific P.E. classes and sports like basketball, cross country, soccer, swimming, and track. *Id.* ¶¶ 14–15. The school board worries that girls will be harmed if they are forced to compete in contact sports with boys who identify as girls. *Id.* ¶ 14. Indeed, Louisiana law requires that girls' sports teams be open to females only. *See* La. Stat. Ann. § 4:444(A) (2022). But under the Rule, the school board would have to let males play on girls' teams and enroll in girls' P.E. even though girls' athletic opportunities will be undermined and the fairness of women's sports will be jeopardized. *Id.* ¶ 16. The school board would also have to change its policies and practices when it comes to privacy and safety. For example, school board policy requires that any search of a student be conducted by a teacher or administrator "of the same sex as the student to be searched." Compl. Ex. 1-A  (Doc. 1-2) p.111. It would also have to change its practice of limiting facilities designated for "men" or "boys" to biological males and facilities designated for "women" or "girls" to biological females. Compl. Ex. 1 ¶ 20. The school board does not wish to make any of these changes. *Id.* ¶ 25. But the Rule would force it to do so.

## LEGAL STANDARD

A court may issue a preliminary injunction when a movant shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that outweighs any harm that will result if the injunction is granted; and (4) an injunction is in the public interest. *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021). The same standards apply to "postpon[ing] the effective date of an agency action," 5 U.S.C. § 705, to "prevent irreparable injury," *Wages & White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021).

## ARGUMENT

## I.     The school board is likely to succeed on the merits.

To show a likelihood of success on the merits, the school board "must present a prima facie case but need not show that [it] is certain to win." *Janvey v. Alguire¸* 647 F.3d 585, 595–96 (5th Cir. 2011) (cleaned up). The school board is likely to show that the Rule is contrary to the statute, inconsistent with the Constitution, and arbitrary and capricious. 5 U.S.C. § 706(2).

## A.     The gender-identity mandate is contrary to law.

Title IX states that "[n]o person in the United States shall, *on the basis of sex*, … be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Unlike other antidiscrimination statutes, Title IX does not require schools to ignore an individual's sex. Instead, Title IX's text, history, and implementing regulations show that Title IX allows and sometimes requires schools to consider it. And that means biological sex, not the undefined concepts of "gender identity" or "sex stereotypes" that ignore physiology in favor of a person's "sense of their gender."

## 1.     Statutory text and structure prohibit the agency from transplanting *Bostock*'s Title VII standard onto Title IX.

To interpret a statute, courts "begin with the text's plain meaning, ascertained by reference to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Allen v. Vertafore, Inc.*, 28 F.4th 613, 617 (5th Cir. 2022) (cleaned up). Courts give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). As used in Title IX, the phrase "on the basis of sex" refers to the biological binary of male and female, not to "an individual's sense of their gender." 89 Fed. Reg. at 33,809. Indeed, *Bostock* treated the word "sex" in Title VII, 42 U.S.C. § 2000e-2(a),

as a reference "only to biological distinctions between male and female," 590 U.S. at 655. *Bostock* concluded that *any* consideration of sex triggers Title VII's anti-discrimination provision: "*if changing the employee's sex would have yielded a different choice by the employer*[, ]a statutory violation has occurred." 590 U.S. at 659–60 (emphasis added).

Like the *Bostock* Court, the Rule assumes that Title IX uses the word "sex" to refer to "physiological sex characteristics." 89 Fed. Reg. at 33,807. It then declares that Title IX "clearly encompasses discrimination on the basis of sexual orientation and gender identity, given that such bases of discrimination meet the same but-for causation test relied upon in *Bostock*." *Id.* at 33,807.

But *Bostock*'s logic does not work with Title IX.

To begin, the text forecloses it. Title IX repeatedly allows schools to consider an individual's sex. The statute permits schools to go from admitting "students of one sex" to "students of both sexes." 20 U.S.C. § 1681(a)(2). It exempts "father-son or mother-daughter activities," while requiring that "if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex." *Id.* § 1681(a)(8). And the statute must be construed to allow "separate living facilities for the different sexes." *Id.* § 1686.

ED tries to have it both ways by inserting the new and atextual "more than de minimis harm" standard into its definition of "discrimination." It reasons that Congress *intended* to "permit" schools to discriminate by inflicting "more than de minimis harm" on students in statutorily approved "contexts." 89 Fed. Reg. at 33,816; *see* 89 Fed. Reg. at 33,887 (exempting the regulation for separate "housing" from its gender-identity mandate *even though*, the agency says, "prevent[ing] a person from participating in [housing] consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex"). At the same time, it includes its regulation for separate male and female sports teams, 34 C.F.R.

10

§ 106.41(b), even without a statutory basis for allowing so-called de minimis harm in that context. And it skates by the implications for individuals who identify as "nonbinary" without explaining how the presumptively "more than de minimis harm" to them is allowable. 89 Fed. Reg. at 33,818.

This is not a reasonable reading of the statute. Discrimination is the "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011) (cleaned up). The Supreme Court explained in 1975—a few years after Title IX's enactment—that distinctions between males and females are problematic when they "*have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the capabilities of its individual members.*" *Frontiero v. Richardson*, 411 U.S. 677, 686–87 (1973) (emphasis added). So "discrimination 'on the basis of sex'" requires more than treating males and females differently; it means subjecting someone to "less favorable' treatment" than similarly situated persons based on biological status as male or female, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where "there is no justification for the difference in treatment," *CSX*, 562 U.S. at 287. When a difference *is* justified and neither sex is "relegat[ed] … to inferior legal status," *Frontiero*, 411 U.S. at 686–87—such as when sex distinctions protect bodily privacy or ensure safety or equal opportunities—no sex discrimination occurs. *Cf. Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) (a "practice[ ]" that "treats a person *worse* because of sex" is discriminatory under Title VII (cleaned up)). These principles confirm that Title IX permits—and even requires—schools to consider and make distinctions based on sex. *See Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022).

Longstanding regulations similarly recognize that Title IX cannot be construed to treat all sex distinctions as discrimination. These regulations protect (1) sex-education classes designated by sex, 34 C.F.R. § 106.34(a)(3); (2) "separate

toilet, locker room, and shower facilities on the basis of sex" so long as the facilities are comparable, *id*. § 106.33; and (3) separate "physical education classes or activities during participation in [contact sports]," *id*. § 106.34(a)(1).

The Rule leaves all of these provisions in place but subjects them to its gender-identity mandate. *See* 89 Fed. Reg. at 33,887. That means schools can maintain separate facilities and classes, but they must be separated by *gender identity*, not sex. That logic works only if "sex" is redefined as "gender identity." *E.g.*, 34 C.F.R. § 106.33 ("separate toilet, locker room, and shower facilities on the basis of [gender identity]"). But the agency does not claim that the word "sex" really means gender identity, so foundational principles of administrative law prohibit ED from defending the Rule on that basis. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). The agency must rely on the reasons given in the Rule, *see DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908–09 (2020) (*Regents*), and the Rule assumes that "sex" refers to the biological differences between male and female. *See* 89 Fed. Reg. at 33,802, 33,807.

Indeed, Title IX provides a rule of construction recognizing that schools *may* consider an individual's sex: *"[N]othing [in Title IX] shall be construed to prohibit"* schools *"from maintaining separate living facilities for the different sexes."* 20 U.S.C. § 1686 (emphasis added). One cannot apply that rule of construction and conclude that Title IX is violated every time "changing the [student's] sex would have yielded a different choice by the [school]." *Bostock*, 590 U.S. at 659–60. After all, when assigning a male student to the men's dormitory instead of the women's, the school necessarily considers his sex. The Rule relies on *Bostock*'s but-for test, *e.g.*, 89 Fed. Reg. at 33,807, but that test does not work unless the statute at issue makes it unlawful to notice sex. Section 1686 disproves ED's central premise.

Even if the agency argued that the word "sex" really includes "gender identity," that interpretation would be unreasonable and not entitled to deference.

In 1972, "sex" was commonly understood to refer to biological differences between male and female. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812–13 (11th Cir. 2022) (en banc) (noting "the overwhelming majority of dictionaries" in the 1970's defined "'sex' on the basis of biology and reproductive function"). Sex was described as an "immutable" trait, "determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686.

That is how courts have long understood the statute. As the Ninth Circuit put it, "actual [physical] differences between the sexes" show that men and women "are not similarly situated in certain circumstances," like athletics, "due to average physiological differences." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1129, 1131 (9th Cir. 1982) (cleaned up). If sex meant gender identity, it would make no sense to talk about "average physiological differences." The court should thus reject any suggestion that "sex" includes "gender identity."

> ## 2.   Historical background and context foreclose a gender-identity mandate that deprives girls of privacy and opportunities.

Title IX must be "interpreted in its … historical context." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). Title IX's historical backdrop reveals the statute's purpose: to remedy "discrimination against women in education." *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999). "Title IX's remedial focus is … on the underrepresented gender; in this case, women." *Cohen v. Brown Univ.*, 101 F.3d 155, 175 (1st Cir. 1996).

This historical context precludes ED from applying "the same but-for causation test relied upon in *Bostock*." 89 Fed. Reg. at 33,807. *Bostock* concluded that Title VII forbids sex distinctions in employment because "sex is not relevant to the selection, evaluation, or compensation of employees." 590 U.S. at 660 (cleaned

up). But in many circumstances sex *is* relevant at school. Title IX and its long-standing regulations recognize that in two general areas: societal privacy norms and physical differences. The Rule itself acknowledges as much by leaving in place longstanding allowances for sex-specific restrooms, locker rooms, and showers, P.E. classes, athletics, and sex-ed instruction. But it redefines the basis of separation as gender identity, not sex.

Schools cannot provide equal opportunity while ignoring sex.

*First*, consider privacy norms. Nearly every civilization recognizes a norm against exposing one's unclothed body to the opposite sex. *See Doe v. Luzerne Cnty.*, 660 F.3d 169, 176 (3d Cir. 2011); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008); *Poe v. Leonard*, 282 F.3d 123, 137–38 (2d Cir. 2002). And "[s]eparating bathrooms based on sex dates back as far as written history will take us." *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1328 (11th Cir. 2021) (Pryor, J., dissenting) (cleaned up), *rev'd en banc*, 57 F.4th 791 (11th Cir. 2022). Many young women would feel unwelcome at school if the price of entry was sharing dorms and locker rooms with males. *E.g.*, MPI App. (Ex. B) 0077–79. So eliminating female-only facilities would undermine—not promote—educational opportunities for women. No wonder the regulations have long permitted sex-specific "toilet, locker room, and shower facilities." 34 C.F.R. § 106.33.

But single-sex privacy means nothing if gender identity controls. The interest in bodily privacy is sex-specific *because of*—not in spite of—the anatomical differences between male and female. *See, e.g.*, *Adams*, 57 F.4th at 803 n.6. Separating private spaces based on gender identity thus "den[ies] all affected persons the dignity and freedom of bodily privacy." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 824 F.3d 450, 452 (4th Cir. 2016) (Niemeyer, J., dissenting from denial of rehearing). ED cannot reasonably interpret Title IX to require that schools open their "toilet, locker room, and shower facilities," 34 C.F.R § 106.33, to

14

individuals with the anatomy of the opposite sex, whatever their gender identity. It is not reasonable to exempt "housing" from the gender-identity mandate but impose it on the private facilities that women use when away from home, like showers and locker rooms. In all such facilities, anatomy, not "identity," matters for privacy.

*Second*, consider also athletic performance. Males as a class consistently beat females in athletic competition because they can run faster and jump higher and farther than comparably fit girls and women. MPI App. 0162–67, 0202–07, 0239, 0302–18. Competing against boys subjects girls to greater risks of injury and more severe injury. MPI App. 0204–05, 0244–47, 0410–22. These harms—unfair competition and risks of injuries—deprive girls of equal opportunity and are a known consequence of eliminating female-only sports. *See* MPI App. 0053–76 (discussing and citing evidence).

These physiological, sex-based differences are the very reason the statute has long been interpreted to allow and even require sex-specific sports: women will not have equal opportunities if they must compete with men. The law allows, for example, physical fitness standards tailored for each sex, *see Bauer v. Lynch*, 812 F.3d 340, 350–51 (4th Cir. 2016), or the U.S. Navy to have different standards for promoting male officers than for female officers, *see Parham v. Hughes*, 441 U.S. 347, 355 (1979). And typically, "effective accommodation" requires equal "participation opportunities" and equal "competitive schedules and opportunities for men's and women's teams." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 299–301 (2d Cir. 2004). By thwarting these equal opportunities, the Rule conflicts with Title IX's historical context.

### 3. Constitutional canons of statutory construction require rejecting the Rule.

Along with Title IX's plain text and historical context, the gender-identity mandate also contradicts constitutional canons of statutory construction.

#### a) The agency has not shown clear congressional authorization.

Federalism principles require that Congress "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (cleaned up). Even in interpreting "expansive language," courts "insist on a clear" statement before intruding on the states' traditional police powers, *Bond v. United States*, 572 U.S. 844, 860 (2014), which include public education, *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

Moreover, when Congress uses its Spending Clause authority, "Congress [must] speak with a clear voice," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), to give fund recipients notice of their obligations, *see Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022). Congress may not use "expansive language" to impose vague conditions. *Bond*, 572 U.S. at 857–58, 860. So an agency may not add new conditions unless "Congress *itself* … ha[s] spoken." *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022) (cleaned up).

The Rule's gender-identity mandate is not "unmistakably clear in the language of [Title IX]." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). In 1972, no one understood "discrimination on the basis of sex" to require schools to *ignore* sex in favor of gender identity. *See Adams*, 57 F.4th at 815. And Title IX's rule of construction has recognized sex-specific privacy interests for fifty years. 20 U.S.C. § 1686. The Biden administration's gender-identity mandate is an unfair "surpris[e]" if ever there was one. *Pennhurst*, 451 U.S. at 25.

#### b) The agency's reading of Title IX would exceed Congress's Spending Clause power.

The Rule reads Title IX to extend beyond Congress's Spending Clause power. The Rule amounts to "economic dragooning that leaves the States with no real option but to acquiesce" to the federal government's policy. *Nat'l Fed'n of Indep.*

*Bus. v. Sebelius*, 567 U.S. 519, 582 (2012) (opinion of Roberts, C.J.). The Court should avoid that constitutional problem by rejecting the agency's statutory interpretation.

The Rule's conditions are unconstitutionally coercive. To be sure, the conditional-spending doctrine allows Congress to persuade the states to adopts its preferred policies. It can even apply some pressure through financial inducements. *Id.* at 575–85 (opinion of Roberts, C.J.). But that authority ends when "pressure turns into compulsion." *Id.* at 577–78 (opinion of Roberts, C.J.) (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)). Compulsion easily describes the Rule. The school board has to adopt the Rule's new gender-identity mandate or give up 10% of its budget. That coercion is all the more obvious considering that states and schools must upend "intricate statutory and administrative regimes [implemented] over the course of many decades." *Id.* at 581 (opinion of Roberts, C.J.). Requiring schools nationwide to give up all federal funding is a "gun to the head." *Id.*

ED also exceeds Congress's Spending Clause power by claiming that the Rule preempts contrary state law. *See* 89 Fed. Reg. at 33,541–42, 33,885 (to be codified at 34 C.F.R. § 106.6(b)). Foremost among the relevant state laws are the statutes in 24 states, including Louisiana, that prohibit schools from opening girls' athletic teams to biological males. *See* La. Stat. Ann. §§ 4:441–46 (2022); Compl. ¶ 126. For two reasons, the Rule cannot preempt those laws. First, the anti-commandeering doctrine prevents the federal government from requiring the states to repeal their laws. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018). Second, the Spending Clause does not give an administrative agency power to authorize schools to violate state law. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings*, 596 U.S. at 219

17

(quoting *Pennhurst*, 451 U.S. at 16, 17). There is no "conflict" between following state law and declining to accept conditions on federal funding, so there is no preemption. *Murphy*, 584 U.S. at 471; *cf.* Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 132 (2021) (arguing that Spending-Clause legislation cannot preempt state law).

These doctrines also illustrate why it is unreasonable to apply *Bostock* to Title IX. Title VII is not Spending Clause legislation, so *Bostoc*k did not consider the "particularly strict" effect of the clear-notice canon applied to conditions on federal spending, *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990), or the limits of Congress's spending power.

### c)   The agency's interpretation ignores the major-questions doctrine

The major-questions doctrine also forecloses the Rule's gender-identity mandate. Like HHS's nationwide ban on evictions, the Labor Department's nation-wide vaccine mandate, or the EPA's restructuring of the nation's energy industry, imposing a novel gender-identity mandate on all schools and education programs is a matter of "staggering" "economic and political significance" for which Congress has given ED no clear authority. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (cleaned up). The political significance is obvious given recent public discourse surrounding sex-specific facilities and allowing men to participate in women's sports. The economic significance is also massive—subjecting schools nationwide to the loss of billions of dollars from Title I, IDEA, and the many other federal funding programs relied on by states and schools to establish their education systems. Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). The Rule's gender-identity mandate is a major policy change. It cannot be adopted by an administrative agency like ED.

*      *      *

Even where a statute is subject to "competing plausible interpretations," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), the statute must be construed "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (cleaned up). Here, the clear-statement rule, the limitations on Spending Clause legislation, the major-questions doctrine, and constitutional avoidance all foreclose ED's interpretation of Title IX and prove that the Rule is contrary to law.

**B.     The Rule infringes on First Amendment rights.**

Both teachers and students retain their First Amendment freedoms on school campuses. Teachers' speech as citizens on matters of public concern is protected by the First Amendment, *see Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), and the issue of "gender identity" is "a hotly contested matter of public concern," *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021).

Though ED insists that the Rule does not require schools to "infringe" on anyone's First Amendment rights, its assurance rings hollow. *See* 89 Fed. Reg. at 33,492, 33,497. The Biden administration has repeatedly claimed that failing to endorse a gender identity that differs from sex, including through pronoun usage, is discrimination. Compl. ¶¶ 177–87; *see* 89 Fed. Reg. at 33,504 (citing, *inter alia*, *L.M. v. Town of Middleborough*, 677 F.3d 29, 38 (D. Mass. 2023)). The Rule says a person must be treated according to "gender identity" rather than biological sex, and failure to do so imposes "more than de minimis harm." 89 Fed. Reg. at 33,887. The Rule also says anything "unwelcome" that "limits" access to the educational program is harassment. Surely anything the Rule considers "more than de minimis harm" meets that low threshold. Indeed, under the Rule, such harassment no longer needs to be "severe." "Pervasiveness" is enough, and the use of pronouns is likely to

19

be pervasive given their ubiquity in everyday conversation. *Supra* at 6–7. So the Rule treats it as sex-based harassment to say that there are only two sexes or decline to use gender-identity-based pronouns.

The Rule would force the school board to compel and censor the speech of its staff and students. *See* 89 Fed. Reg. at 33,888 (to be codified at 34 C.F.R. § 106.44(a) (schools must investigate any "conduct that *may constitute* sex discrimination"). As to compulsion, this includes mandating that staff and students use gender-identity-based pronouns, which "convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508; *accord Varner*, 948 F.3d at 256; *Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 741–42 (Va. 2023). As to censorship, the Rule calls for schools to punish speech expressing views about sex and gender that the administration dislikes, such as that sex is "immutable," *Frontiero*, 411 U.S. at 686, and that differences between the sexes are "enduring," *United States v. Virginia*, 518 U.S. 515, 533 (1996); *see Meriwether*, 992 F.3d at 508. A federal agency may not order local governments to violate citizens' constitutional rights.

 "[R]egulating speech because it is [believed to be] discriminatory or offensive is not a compelling state interest." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019). The federal government lacks any legitimate objective "to produce speakers free" from purported bias, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995), so any nondiscrimination interest cannot justify compelling or silencing speech, *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 (2023). Indeed, this interest is "comparatively weak" in the context of education. *Meriwether*, 992 F.3d at 509–10.

The Rule also defines sex-based discrimination to include "gender identity," "sex stereotypes," and "sex characteristics," but refuses to define those terms. That renders the Rule unconstitutionally vague and overbroad. To avoid being labeled a harasser or disciplined, reasonable students and staff will refrain from speech at

the cost of their First Amendment rights, which creates an "impermissible risk of suppression of ideas." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992). Even if the Biden administration's views on sex and gender are "embraced and advocated by increasing numbers of people," that "is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Meriwether*, 992 F.3d at 510.

### C.   The Rule is arbitrary and capricious.

The Rule is arbitrary and capricious for at least seven reasons, each of which requires preliminary relief. *First*, the Rule acts irrationally by resting its gender-identity mandate on *Bostock*, even though *Bostock* explicitly disclaimed "bathrooms, locker rooms," or other statutory contexts allowing distinctions based on sex. ED knew about this problem. *See* MPI App. 0003–09. The Rule's pivotal reliance on *Bostock* represents a fundamental error at the heart of the Rule and renders it arbitrary and capricious on its face.

*Second*, the Rule disregards the privacy interest in not exposing one's unclothed body to persons of the opposite sex. *See supra* at 14. By putting persons of the opposite sex into private spaces, the Rule creates a serious risk that children will have to expose their bodies to the opposite sex against their wishes. MPI App. 0050, 0076–80. ED's dismissal of privacy interests reflects a lack of reasoned decision-making.

*Third*, the rule does not provide a reasoned explanation for requiring schools to enroll males in girls' P.E. classes and play on girls' sports teams despite the inherent physical advantages enjoyed by males and the greater risk of injury this poses for girls. *See supra* at 15. The Rule does not even acknowledge that its gender-identity mandate applies in these contexts, so it necessarily fails to provide a reasoned explanation for doing so. That is arbitrary and capricious.

*Fourth*, ED's suggestion that schools discriminate based on "sex stereotypes" when requiring students to access sex-specific facilities and programs based on their sex rather than their gender identity is unreasoned. "[B]iological differences between males and females" are "not stereotypes associated with either sex." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *accord L. W. ex rel. Williams v. Skrmetti,* 83 F.4th 460, 484 (6th Cir. 2023). ED fails to give a reasoned explanation for treating biological differences as if they were sex stereotypes within *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality), despite comments bringing that problem to its attention. *See* MPI App. 0014–15.

*Fifth*, ED ignored the effect of its Rule on school policies that require staff to conceal a child's request to be treated as the opposite sex from the child's parents. The notice of proposed rulemaking, 87 Fed. Reg. 42,390 (July 12, 2022), favorably cited two such policies, *see* 89 Fed. Reg. at 33,709, and the notice-and-comment process made the agency aware of this threat to parental rights, *see* MPI App. 0035–48. To comply with the APA, an agency must "consider and respond to significant comments" like these. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Yet the Rule says nothing about the parental-exclusion policies that it seems to endorse. 89 Fed. Reg. at 33,709. By "entirely fail[ing] to consider [this] important aspect of the problem," *Motor Vehicle Mf'rs Ass'n v. State Farm Auto Mut. Ins. Co*., 463 U.S. 29, 43 (1983), the Rule is arbitrary and capricious.

*Sixth*, ED disregarded schools' reasonable reliance interests when promulgating the Rule. For instance, the agency glossed over the changes to longstanding policies, practices, and facilities that schools would need to undertake to comply with the Rule while respecting the privacy and safety of all students. Schools adopted existing policies and practices and built expensive facilities based on ED's prior positions—for example, building communal restrooms and locker

rooms rather than single-occupant facilities. Ex. A ¶ 3. The failure to consider reliance interests renders the Rule arbitrary. *Regents*, 140 S. Ct. at 1910–13.

*Finally*, the agency failed to consider alternative policies, such as (1) creating rules to protect privacy and girls' equal access to athletic programs and physical education; (2) grandfathering existing categories of programs and practices covered by Title IX; or (3) creating or expanding existing exemptions for those with privacy or safety concerns or other reliance on past policies. *See id.* at 1913.

## II.      The school board will be irreparably harmed by the Rule.

The school board is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). That is the case here. The Rule would force the school board to amend its policies and procedures at significant cost. Compliance would require, at a minimum, many amendments to existing policies and practices and time spent analyzing and discussing the Rule. Ex. A ¶¶ 4–5; Compl. ¶¶ 26–30, 137–54. Compliance would take at least 50 hours of the Title IX coordinator's time, along with consuming resources on legal advice and time spent by the school board to consider and adopt new policies. Ex. A ¶ 4. Training the school board's 3,200 employees on the Rule's new requirements, too, would cost the school board millions of dollars in educator time. *Id.* ¶ 5. These harms are irreparable because there is no cause of action or waiver of sovereign immunity to recover compliance costs from the federal government. *See Wages & White Lion*, 16 F.4th at 1142; *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). Postponing the effective date of the Rule under 20 U.S.C. § 705 would subvert these harms.

## III.      The equities and the public interest favor the school board.

The court must "balance the harm that would be suffered by the public if the preliminary injunction were denied against the possible harm that would result to

[the defendants] if the injunction were granted." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985). A preliminary injunction is appropriate where the "irreparable harm asserted is the adverse impact … on the public," and the "dominant presence of the public interest" is a "central issue in th[e] case." *Id.* at 623 (cleaned up).

Here, the threatened harm to the school board, schoolchildren, staff, and families outweighs any harm to the federal government. Loss of federal funds would harm the school board's most underserved students. For example, federal funds are used to provide after-school tutoring on campus and at local homeless shelters, Ex. A ¶ 10, and to provide bus passes, school uniforms, winter clothes, and hygiene kits for students experiencing homelessness, *id.* ¶ 11. Federal funding is used to provide specialized services to English language learners and migratory students. *Id.* ¶ 12. Federal funds also enable the school board to serve children with disabilities. For example, the school board uses IDEA funds to provide extended school-year programs and special education remediation instruction during the summer. *Id.* ¶ 13. IDEA preschool funding also allows the school board to hire professionals dedicated to providing special education for the youngest children, including by funding salary and benefits for its special-education preschool teachers and nurses. *Id.* ¶ 14.

Loss of all federal funds also would inhibit the school board's ability to recruit effective educators and keep school campuses safe. Federal funds are used to purchase and maintain security cameras and operate secure single points of entry for school campuses, for example. *Id.* ¶ 16. The school board uses federal funds to conduct high-quality professional development for teachers and principals and to recruit highly qualified teachers for schools that are low-performing or have a high percentage of economically disadvantaged students. *Id.* ¶ 17. Federal funds are used to pay salaries and benefits for of the school board's pre-kindergarten teachers and

have enabled the school board to decrease student-teacher ratios in kindergarten through second-grade classrooms. *Id.* ¶¶ 18–19.

If the school board lost federal funding, it would have to either cancel these programs and services or seek new funding. *Id.* ¶ 20. Even if new funding could be found, programs would likely be shut down in the meantime. *Id.*

Defendants will not be prejudiced by temporary relief, which would "simply suspend administrative alteration of the status quo" that has existed for fifty years under Title IX. *Wages & White Lion*, 16 F.4th at 1144 (cleaned up). It took ED nearly two years to finalize the Rule, and it has been more than three years since the President instructed agencies to apply *Bostock*. The Biden administration can hardly object to delay while judicial review is completed. Indeed, the federal government regularly consents to using 5 U.S.C. section 705 to delay rules' effective dates. *E.g.*, HHS Services Grants Regulation, 87 Fed. Reg. 31,432 (May 24, 2022) (delays over 15 months). Meanwhile, the school board and other institutions will keep applying Title IX as it has been understood for the last five decades—based on sex, not gender identity—during this litigation. There is no injury to Defendants.

## CONCLUSION

The Court should delay the effective date of the Rule or enter a preliminary injunction prohibiting enforcement of the Rule during this litigation. Because the relief requested would serve the public interest, the school board asks the Court to exercise its discretion not to require a security or bond under Federal Rule of Civil Procedure 65(c). *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,* 636 F.2d 1084, 1094 (5th Cir. 1981).

Respectfully submitted this 14th day of May, 2024.

s/ Michael T. Johnson
**Michael T. Johnson**
LA Bar No. 14401
**Johnson, Siebeneicher & Ingram**
2757 Highway 28 East
Pineville, Louisiana 71360
Telephone: (318) 484-3911
Facsimile: (318) 484-3585
mikejohnson@jslawfirm.com

s/ Natalie D. Thompson
**Natalie D. Thompson\*\***
   **(Lead Attorney)**
WDLA Temp. Bar No. 918095
**Matthew S. Bowman\***
WDLA Temp. Bar No. 913956
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
nthompson@ADFlegal.org
mbowman@ADFlegal.org

**Julie Marie Blake\***
WDLA Temp. Bar No. 918094
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

\*      *Admitted pro hac vice*
\*\*     *Admitted pro hac vice; practice supervised by members of the D.C. Bar while application is pending*

*Counsel for Plaintiff Rapides Parish School Board*

26